Barbara RUSH, Individually and on behalf of her minor child Roberto Boyce, and on behalf of all others similarly situated, Plaintiffs-Appellees,

v.

J. Henry SMITH, Individually and as Commissioner of the New York City Department of Social Services, and Carmen Shang, Individually and as acting Commissioner of the New York State Department of Social Services, Defendants-Appellants.

No. 523, Docket 77–7518.

United States Court of Appeals, Second Circuit.

Argued Dec. 9, 1977.

Decided Jan. 19, 1978.

Leonard Koerner, New York City (W. Bernard Richland, Corp. Counsel of the City of New York, and Edward J. Schwarz, New York City, of counsel), for defendant-appellant J. Henry Smith.

Marion Buchbinder, Deputy Asst. Atty. Gen., State of New York, New York City (Louis J. Lefkowitz, Atty. Gen. of the State of New York, Samuel A. Hirshowitz, First Asst. Atty. Gen., and Rosalind Fink, Asst. Atty. Gen., New York City, of counsel), for defendant-appellant Carmen Shang.

Marshall W. Green, Staten Island, N. Y. (John E. Kirklin and Constance P. Carden, New York City, Joan Mangones and David Goldfarb, Staten Island, N. Y., of counsel), for plaintiffs-appellees.

Before FRIENDLY, SMITH and MESKILL, Circuit Judges.

FRIENDLY, Circuit Judge:

This appeal from an order of Judge Stewart in the District Court for the Southern District of New York, raises the question how far the Social Security Act (the Act), 42 U.S.C. § 601, et seq.,[1] preempts the City and State of New York from combatting fraud by recipients of Aid for Dependent Children (AFDC) benefits.

The Supreme Court has described the AFDC program as a "scheme of cooperative federalism," *Jefferson v. Hackney,* 406 U.S. 535, 542, 92 S.Ct. 1724, 32 L.Ed.2d 285 (1972); see *Batterton v. Francis,* 432 U.S. 416, 97 S.Ct. 2399, 53 L.Ed.2d 448 (1977). As is now well known, basic standards of eligibility are set by Congress, with the Secretary of Health, Education and Welfare (HEW) authorized by §§ 602(a)(5) and 1302 of the Act to flesh out the administrative details by regulations. Sections 601 and 602 require that a State plan, which must conform to twenty-eight separate requirements, shall be submitted to and, if found to conform, be approved by the Secretary. Each state may determine the level of need it proposes to meet; the Federal Government pays a percentage of the cost. Administration of the plan is left to the states and their subdivisions, subject to some general provisions of § 602(a) which require *inter alia* that the State plan must "either provide for the establishment or designation of a single State agency to administer the plan, or provide for the establishment or designation of a single State agency to supervise the administration of the plan," § 602(a)(3); must "provide for granting an opportunity for a fair hearing before the State agency to any individual whose claim for aid to families with dependent children is denied or is not acted upon with reasonable promptness," § 602(a)(4); and must "provide such methods of administration . . . as are found by the Secretary to be necessary for the proper and efficient operation of the plan," § 602(a)(5).[2]

The commission of fraud with respect to any of the programs under the Act is made a misdemeanor by 42 U.S.C. § 1307. Pursuant to § 1302, the Act's general authorization for agency rulemaking, the Secretary has adopted 45 C.F.R. § 235.110, entitled "Fraud." This requires that the State plan provide:

(a) That the State agency will establish and maintain:

(1) Methods and criteria for identifying situations in which a question of fraud in the program may exist, and

(2) Procedures developed in cooperation with the State's legal authorities for referring to law enforcement officials situations in which there is valid reason to suspect that fraud has been practiced. The definition of fraud for purposes of this section will be determined in accordance with State law.

(b) For methods of investigation of situations which there is a question of fraud, that do not infringe on the legal rights of persons involved and are consistent with the principles recognized as affording due process of law.

(c) For the designation of official position(s) responsible for referral of situations involving suspected fraud to the proper authorities.

In response to this requirement, New York has adopted Social Services Law § 145 making various welfare frauds misdemeanors and 18 N.Y.C.R.R. § 348.2. Paragraph (a) directs each social service district to:

(a) Establish and maintain clear and adequate policies, procedures and controls in

---

1. Section references to the Act will be by the section numbers appearing in 42 U.S.C.

2. As Representative Doughton said in reporting the Social Security Act of 1935 out of committee:

In fact, these provisions limit very strictly the supervisory powers of the Social Security Board over the States, and provide a maxi-

mum of State control in these matters. The federal standards or conditions included in the law may, indeed, be regarded as minimum conditions, leaving to the States the determination of policies, the detailed administration, the amount of aid which shall be given, and questions of personnel.

79 Cong.Rec. 5469 (1935).

order to effectively handle cases of suspected fraud in the administration of public assistance and care.

Paragraph (d) provides that each such district shall:

(d) Designate a person, either of administrative or supervisory responsibility or in a consultative capacity to the local district such as a welfare attorney, or establish a unit which shall consist of persons of similar responsibility, to which all cases of known or suspected fraud shall be referred, to perform the following functions:

(1) review district material referred, including any that may be legal evidence;

(2) determine whether that material indicates that reasonable grounds exist to believe that fraud was committed by the applicant or recipient and/or others;

* * * * * *

(4) determine the existence of any mitigating facts or circumstances;

(5) promptly refer to the appropriate district attorney or other prosecuting official all cases wherein reasonable grounds exist to believe that fraud was committed. . . .

Any existing mitigating facts or circumstances known to the department shall be included in the referral;

(6) maintain liaison with such appropriate district attorney or other prosecuting official and endeavor to secure reports of actions taken with respect to cases referred;

(7) promptly advise the appropriate district attorney or other prosecuting official whenever restitution, or arrangements for restitution of fraudulently received public assistance funds has been made, or is being made.

Pursuant to these requirements New York City's Income Maintenance Procedure 78–76 provides for four units in the Office of the Inspector General of its Human Resources Administration, entitled respectively Duplicate Check Unit, Eligibility Investigation, Concealed Assets, and Special Investigation. The Duplicate Check Unit was established to call in and interview clients who are believed to have fraudulently cashed two or more checks which they reported as lost, stolen or undelivered and were subsequently replaced. The procedures provide that failure by a recipient of benefits without good excuse to report for an interview requested by the Office will result in a termination of benefits.[3]

In March, 1977, the Inspector General sent a letter to plaintiff Barbara Rush requiring her to report for an interview; the text of the letter is set out in the margin.[4] Ms. Rush consulted the Legal Aid Society; a law intern wrote the Inspector General that Ms. Rush would not attend the interview and considered the threatened termination of benefits to be a violation of the United States and New York Constitutions and of the Social Security Act. After a "fair hearing," see note 3, assistance under the AFDC program was terminated.

**3.** Such termination can occur only after a State "fair hearing" (if requested) in which the recipient may challenge the proposed discontinuance. N.Y.C. Dept. of Soc. Services, Notice of Intent to Discontinue Public Assistance; N.Y. C.R.R. § 351.23(b); 42 U.S.C. § 602(a)(4).

**4.** Dear Public Assistance Clients:

Our records indicate that you have cashed 2 checks since 1974 which you had reported to us as lost, stolen or undelivered. At the time we replaced those checks, you had signed an affidavit stating that you would not cash the missing checks if they came into your possession.

A review of the case must be conducted and if the evidence indicates fraudulent receipt of public assistance, Section 145 of the State Social Services Law requires that the case be referred to the District Attorney. Therefore, you must report to the Office of the Inspector General of the Human Resources Administration at the following address and time:

* * * * * *

You are entitled to bring a representative to be present at the interview. Please bring your photo ID card and this letter for purposes of identification. If you have any questions about this letter, you can call 553–5159. Failure to report will result in termination of your public assistance payments.

Signature illegible
Inspector General

Ms. Rush then brought this action, pursuant to 28 U.S.C. § 2201 and 2202, 42 U.S.C. § 1983 and 28 U.S.C. § 1343(3), for declaratory and injunctive relief on behalf of herself and all other persons similarly situated. She contended that the request to appear, coupled with a threat to terminate benefits for nonappearance, violated her privilege against self-incrimination and imposed a condition of eligibility not authorized by the Social Security Act. In response to her request for interlocutory relief, defendants submitted an affidavit of the Director of the Fraud Control Division describing the way in which interviews were carried out. This was as follows: [5]

12. In addition, all case workers who interview welfare recipients in the Fraud Control Division are instructed to always begin their interviews with "*Miranda* like" warnings by:

(a) Clearly explaining why their case is being administratively reviewed.

(b) Clearly explaining that the Fraud Control Division cannot arrest the welfare recipient for any fraud but that any information of possible fraud must be turned over to the District Attorney as a matter of State law.

(c) Clearly explaining that since the welfare recipient has appeared, their benefits cannot be cut off, even if the welfare recipient admits to having committed fraud.

(d) Clearly explaining that the welfare recipient has three options when asked questions about the alleged fraudulent cashing of welfare checks— the welfare recipient can acknowledge, contest or stand mute, that they cashed welfare checks they previously had reported as lost, stolen or undelivered.

13. When a welfare recipient does elect to stand mute, the interview is immediately ended and the investigation continued without the use of a personal interview.

14. Under no circumstances are the welfare recipient's benefits terminated because of the welfare recipient's refusal to answer any questions, or even if the welfare recipient has admitted committing fraud.

15. As long as the welfare recipient reports to the Fraud Control Division office, the welfare recipient's benefits are continued.

16. Furthermore, as soon as the plaintiff agrees to report to the Fraud Control Division, her benefits will immediately be restored, even if the plaintiff refuses to answer any questions, or even if the plaintiff acknowledges that she fraudulently cashed checks she had previously claimed were lost, stolen or undelivered.

Judge Stewart denied the request for class action certification because plaintiff had failed to satisfy the numerosity requirement of F.R.Civ.P. 23(a)(1) and also because certification was ". . . unnecessary and would not provide a superior method of adjudicating the issue since retroactive monetary relief cannot be awarded under the facts of this case . . . and since it is clear that the prospective efforts of declaratory and injunctive relief will inure to the benefit of all the requested class members," citing *inter alia Edelman v. Jordan,* 415 U.S. 651, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974), and *Galvan v. Levine,* 490 F.2d 1255, 1261 (2 Cir. 1973), *cert. denied,* 417 U.S. 936, 94 S.Ct. 2652, 41 L.Ed.2d 240 (1974). Holding that, as a matter of law, termination of financial assistance for unexcused failure to appear at an interview imposed a condition of eligibility not authorized by 42 U.S.C. § 602(a), the judge granted a permanent injunction against enforcement of this portion of New York City's Income Maintenance Procedure 78–76 and declared it to be invalid. In view of this disposition he found it unnecessary to consider the constitutional claim. After having reinstated Ms. Rush, the City and State sought a stay pending appeal. The judge denied this; we expedited the appeal.

Appellants concede that New York cannot impose conditions of eligibility for

---

**5.** Plaintiff agreed to accept the affidavit as true as far as concerned her statutory claim. *Rush*

*v. Smith,* 437 F.Supp. 576 at n.2 (S.D.N.Y., 1977) (Stewart, *J.*).

AFDC benefits which are in conflict with those specified in § 602(a). The concession is well advised in light of a number of familiar Supreme Court decisions, to wit, *King v. Smith,* 392 U.S. 309, 88 S.Ct. 2128, 20 L.Ed.2d 1118 (1968) (denial of AFDC payments to children of a mother who cohabits with an able-bodied man held to be in conflict with definition of "dependent child" in § 606); *Townsend v. Swank,* 404 U.S. 282, 92 S.Ct. 502, 30 L.Ed.2d 448 (1971) (denial of benefits to 18 to 20 year old children attending a college or university held to be in conflict with § 606(a)(2)(B)); *Carleson v. Remillard,* 406 U.S. 598, 92 S.Ct. 1932, 32 L.Ed.2d 352 (1972) (denial of benefits to child when father's absence was due to military service held to be in conflict with provision as to "continued absence from the home" in § 606(a)); *Philbrook v. Glodgett,* 421 U.S. 707, 95 S.Ct. 1893, 44 L.Ed.2d 525 (1975) (state provision denying benefits for any week during which father was *eligible* for unemployment compensation held to conflict with § 607(b)(2)(C)(ii), permitting denial of such benefits during any week in which father *received* unemployment compensation); *VanLare v. Hurley,* 421 U.S. 338, 95 S.Ct. 1741, 44 L.Ed.2d 208 (1975) (state regulations reducing shelter allowance to the extent nonpaying lodgers live in AFDC household held to conflict with § 606(a)).

Plaintiff here pointed to no such conflict between the New York City procedure and any provision of § 602(a) (or of the definitions in § 606) as existed in the cases just cited. Her argument depended rather upon an unarticulated premise of greater generality than that which these decisions declared and applied. This is that unless an AFDC recipient is or has become ineligible under some specific provision of § 602(a), a State is forbidden to terminate benefits, even when, as here, there is a legitimate ground for believing the recipient has engaged in fraud and has refused to cooperate in the State's investigation of it. We find nothing to support this broader premise and much to refute it.

We begin with the statement in *Jefferson v. Hackney,* 406 U.S. 535, 541, 92 S.Ct. 1724, 1729, 32 L.Ed.2d 285 (1972), that courts may not void state action under the AFDC program "so long as the State's actions are not in violation of any specific provision of the Constitution or the Social Security Act." We have been cited to no provision of the Social Security Act which reads on the challenged New York City procedure. To the contrary, § 602(a)(5) requires a State plan to "provide such methods of administration . . . as are found by the Secretary to be necessary for the proper and efficient operation of the plan" and, under the Act's general rule-making authorization, 42 U.S.C. § 1302, the Secretary has adopted regulation 45 C.F.R. § 235.110 requiring the State agency to provide *inter alia:*

> (b) For methods of investigation of situations which there is a question of fraud, that do not infringe on the legal rights of persons involved and are consistent with the principles recognized as affording due process of law.

Section 602(a) states what persons are eligible; it does not attempt to list all the circumstances in which an otherwise eligible mother may render herself ineligible. Congress has simply not thought it necessary to say anything so patent as that persons who have engaged in fraud or refused to comply with reasonable requests to assist in its investigation may be removed from the rolls.

If there were any doubt about this, *Wyman v. James,* 400 U.S. 309, 91 S.Ct. 381, 27 L.Ed.2d 408 (1971), would dispel it. The New York law there at issue provided that when there had been a refusal to allow home visits, the appropriate public welfare official might suspend or terminate payments, see 400 U.S. 211 n.2, 91 S.Ct. 381. Assistance to Mrs. James had in fact been terminated because of her refusal, 400 U.S. at 314, 91 S.Ct. 381, and the Court upheld this. Appellee seeks to dispose of *James* on the basis that it "was premised and decided on exclusively Fourth Amendment grounds, with no attention or thought being given to the question of the

validity of the New York rule under the Social Security Act." (Brief, p. 29). But the *James* Court was, of course, well aware of the "time-honored doctrine," noted by Mr. Justice Marshall in his dissent, 400 U.S. 345 n.7, 91 S.Ct. 401, "that statutes and regulations are first examined by a reviewing court to see if constitutional questions can be avoided," and of its own recent decision in *King v. Smith, supra,* 392 U.S. 309, 88 S.Ct. 2128, that a state cannot impose a condition of eligibility in conflict with the Social Security Act. It is hardly conceivable that the *James* Court would have undertaken the decision of a difficult constitutional question if the case could have been disposed of on the simple basis that New York had established a condition of eligibility forbidden by the Social Security Act. *James* was "a Fourth Amendment case" (Appellee's brief, p. 29) since New York could not terminate benefits because of a recipient's exercise of a constitutional right; the Court simply regarded it as too clear for argument that if the New York regulation did not violate the Fourth Amendment, the provision for termination was not in conflict with the Social Security Act. Were there doubts regarding the program's statutory validity, the Court would certainly not have stated, as it did, that New York's home visitation plan "serves a valid and proper administrative purpose for the dispensation of the AFDC program," 400 U.S. at 326, 91 S.Ct. at 390. This was made abundantly clear by *New York State Department of Social Services v. Dublino,* 413 U.S. 405, 422, 93 S.Ct. 2507, 2517, 37 L.Ed.2d 688 (1973), where, in rejecting a contention that the Social Security Act preempted a New York work requirement program more severe than the federally sanctioned WIN program, 42 U.S.C. §§ 602(a)(19), 630, et seq., a considerably closer question than that here presented, the Court said:

> Such programs and procedures are not necessarily invalid, any more than other supplementary regulations promulgated within the legitimate sphere of state administration

and cited *Wyman v. James* in support of this.

■ We find no basis for a contrary conclusion in *Lascaris v. Shirley,* 420 U.S. 730, 95 S.Ct. 1190, 43 L.Ed.2d 583 (1975), affirming *Shirley v. Lavine,* 365 F.Supp. 818 (N.D. N.Y.1973) (three-judge court), on which appellee heavily relies. A three-judge court, following the lead of other lower courts, had struck down as in conflict with the Social Security Act a New York statute requiring "recipient cooperation in a paternity or support action against an absent parent as a condition of [AFDC] eligibility . . . ." 420 U.S. at 731, 95 S.Ct. at 1190. The lower court did not find the New York statute to be saved by a provision of federal law which "require[d] a state . . . to develop and implement . . . a program to establish the paternity of the child and to secure support from the deserting parent," 365 F.Supp. at 821. While affirming the three-judge court's decision, the Supreme Court noted that Congress had since then resolved the issue by amending the Social Security Act to require as a condition of eligibility that, like the New York law, "the recipient . . . cooperate to compel the absent parent to contribute to the support of the child," 420 U.S. at 731, 95 S.Ct. at 1190, but also provided that despite the termination of payments to the mother, protective payments should continue to be made to the child. The Court therefore stated that "[i]n light of the resolution of the conflict by Pub.L. 93–647, we have no occasion to prepare an extended opinion," and merely affirmed the lower court without explaining its rationale.[6]

The issue that had come before the three-judge court (prior to the Social Security's Act's amendment) was quite different than that raised here. In that case, Congress had placed the obligation with respect to establishing paternity and support upon the state, not upon the mother, and granted "no authority for engrafting such a condition" on the AFDC program. 365 F.Supp. at 821. Here, by contrast, it was hardly necessary

---

**6.** Three Justices dissented without opinion.

for Congress to say in § 602(a) that the mother should not engage in fraud; if anything was needed, the criminal provision in § 1307 would suffice.

■ Appellee makes the further point that New York has procedures for dealing with the duplicate check problem independent of those here challenged. As soon as the New York City Department of Social Services detects the probability that a recipient who has obtained a duplicate check has also cashed the original one, it issues a Notice of Intent to Reduce Public Assistance and institutes recoupment limited to 10% of household needs, 18 N.Y.C.R.R. § 352.31(d)(4), within 20 days unless a fair hearing is demanded, in which event recoupment is postponed. New York City Dept. of Soc. Services Proc. No. 72–20; cf. *Jackson v. Weinberger,* Civ. 75–280 (W.D. N.Y., Oct. 11, 1977) (upholding as consistent with the Act state regulations permitting gradual recoupment of AFDC overpayments that result from willful withholding of information); *Lomax v. Lavine,* 72 Civ. 2457 (S.D.N.Y., July 31, 1972) (denying motion for preliminary injunction against state regulations providing for recoupment from future public assistance grants of prior duplicate payments).

However, the interests of the State are not limited to the gradual recoupment of funds when an AFDC recipient has obtained a duplicate check and then has cashed both. There is a legitimate interest in sorting out the cases where the illegality might have been minor or in some way excusable and those representing a deliberate and continued plan to mulct the State.[7] In view of the number of cases, the futility of fines and the undesirability of incarceration except as a last resort, a tough lecture may be the best prescription for cases of the former type, with a recommendation for prosecution reserved for the latter. The State also has an interest in detecting persons other than the recipient who have assisted in or even encouraged such frauds, and the recipient's cooperation is extremely valuable.

All these considerations are in conformance with the Secretary's regulation, 45 C.F.R. § 235.110, to which we have already referred, and with 45 C.F.R. § 233.-10(a)(1)(ii)(B), which provides that:

A State may . . . . Impose conditions upon applicants for and recipients of public assistance which, if not satisfied, result in the denial or termination of public assistance, if such conditions assist the State in the efficient administration of its public assistance programs, or further an independent State welfare policy, and are not inconsistent with the provisions and purposes of the Social Security Act.

We find nothing in the Social Security Act that forbids a state to terminate benefits to a recipient who engages in conduct, here the cashing of duplicate checks, which, if done on a considerable scale, would render continued conduct of the AFDC program impossible, or refuses to appear for an interview about this.

We therefore conclude that the district court was unjustified in striking down New York City Income Maintenance Procedure 78–76 as a violation of the Social Security Act. On the other hand, we think a more modest injunction is required.

■ Our first concern is with the form of the letter sent to the AFDC recipient. Although the affidavit of the Director of the Fraud Control Division quoted above tells us that when the AFDC recipient appears, she is told that she has, and that in fact she does have, the option to stand mute, and that her welfare benefits are not terminated because of exercise of this option or even because of an admission of fraud, the letter sent to the recipient does not state this. This omission could well lead to refusals to appear on the part of recipients who would come if they knew what in fact would occur. This would result in an unnecessary increase in terminations and consequent hardship. The City's interest is in having people come in the hope they will cooperate,

7. During 1971 the New York City Department of Social Services paid out approximately $5.4 million in duplicate checks, *Lomax v. Lavine, supra.*

not in having them stay away because of ignorance of what the City's policy in fact is. Whether or not the form of notice "infringe[s] on the legal rights of persons involved," 45 C.F.R. § 235.110(b), it is unreasonable in the respect noted. It also should be made clear that the "representative" whom the recipient is entitled to bring with her may (although need not be) a lawyer.

■ While the point is less clear, we also believe that the City's procedures require change in another respect. Appellee's brief notes that (p. 40*):

> Each time Congress has amended the Social Security Act to add new conditions of eligibility, such as the duty to register for employment (42 U.S.C. § 602(a)(19)), the duty to assign all support rights to the State (42 U.S.C. § 602(a)(26)(A)), or the duty to cooperate in establishing paternity and obtaining support payments (42 U.S.C. § 602(a)(26)(B)), it has expressly provided that if a parent fails to comply with the condition the children are not to be penalized, but are to receive protective payments pursuant to Section 606(b)(2). 42 U.S.C. § 602(a)(19)(F)(i); 42 U.S.C. § 602(a)(26)(B). This specific tailoring of the conditions to preserve the rights of needy children is strikingly absent from the blunderbuss approach of Income Maintenance Procedure 78–76, under which assistance to the entire family is terminated if the parent fails to appear at an OIG interview.

Although, for reasons previously indicated, we do not regard termination for refusal by a recipient to cooperate in an investigation of possible fraudulent conduct as a "condition of eligibility" in any real sense, the instances cited do tend to show a kind of common law of the AFDC statute that the sin of the mother, even such an egregious one as refusing the very modest cooperation New York City has required with regard to her own fraud, shall not be visited upon the children.[8] Recognizing

that a restriction will have a dampening effect on the City's procedure, we nevertheless believe that the termination of benefits to the parent must be accompanied by a provision for protective payments for the children similar to those in the statutory sections cited by appellee.

Because of his belief that the New York Income Maintenance Procedures violated the Social Security Act, Judge Stewart had no occasion to consider plaintiff's Fifth Amendment claim, and plaintiff's concession of the accuracy of the Director's description of the method of conducting interviews did not reach that far, see note 5 *supra*. The issue will have a changed aspect in view of the alterations in the notice we have directed. This point can be further considered if plaintiff should wish to press it.

The order is vacated and the cause is remanded for further proceedings consistent with this opinion. No costs.

---

8. Indeed, New York's own practice, where a recipient is found to have actually committed fraud, is merely to reduce the assistance grant by 10–15% until the overpayments occasioned by the fraud are recovered. Defendant-Appellant's Br. at 11; 18 N.Y.C.R.R. § 352.31(d). To terminate all payments solely for failure to appear seems disproportionate.