15,844 WELFARE RECIPIENTS, including but not limited to Naomi Allen, Judith Cope, Pat Cotter, Anne Doe, Jane Doe, Jane Doe II, Rose Doe, Migdalia Gonzalez, Louise Guenard, Amanda Jones, Shirley Lane, Melvena Lawson, Lorraine Murray, Sue-Ann Ochs, Judith Periera, Marilyn Pollitt, Kathleen Rocci, Nancy Ramos, Shirley Roxas, Pauline Sayers, Paul D. Smith, May L. Stanikmas, Catherine Trites, Lynn Walker, Richard Woodrum, and Catena Zagarella on behalf of themselves and their minor children and all others similarly situated, Plaintiffs,

v.

Edward J. KING, Individually and in his capacity as Governor of the Commonwealth of Massachusetts, Charles H. Mahoney, Individually and in his capacity as Secretary of the Office of Human Services, Edward T. Hanley, Individually and in his capacity as Secretary of the Executive Office of Administration and Finance, John Pratt, Individually and in his capacity as Commissioner of Public Welfare, and James F. Scanlan, Individually and in his capacity as Director of the Bureau of Welfare Auditing, Defendants.

Civ. A. No. 79-643-G.

United States District Court,
D. Massachusetts.

Aug. 23, 1979.

Allan G. Rodgers, Mass. Law Reform Institute, Boston, Mass., Barbara Sard, Greater Boston Legal Service, Roxbury, Mass., for plaintiffs.

S. Stephen Rosenfeld, Betty E. Waxman, Asst. Attys. Gen., Boston, Mass., for defendants.

## MEMORANDUM OF DECISION

GARRITY, District Judge.

Plaintiffs brought this action for declaratory and injunctive relief from an allegedly unlawful welfare fraud investigation commenced by the defendants on the basis of a computer match. On April 3, 1979, after a hearing, we granted plaintiffs' Motion for a Temporary Restraining Order and entered a written order dated April 5, 1979, which we modified on April 6, 1979. On June 11, 1979 we granted plaintiffs' Motion for a Further Temporary Restraining Order in one limited respect only, namely, by directing the defendants to return certain information obtained from welfare recipients in connection with the March 19, 1979 notice and related interviewing process. We denied plaintiffs' Motion for Clarification on June 22, 1979, and on July 3, 1979, we granted one aspect of plaintiffs' June 22, 1979 Motion for Reconsideration and for Further Temporary Relief.

Plaintiffs now seek a preliminary injunction enjoining the defendants from proceeding to redetermine the continuing eligibility of plaintiffs for AFDC benefits based on the 1977 computer match, or, in the alternative, enjoining defendants from redetermining plaintiffs, except upon certain stated conditions. The preliminary injunction would also enjoin defendants from referring any of the plaintiffs to other Bureau of Welfare Auditing, from interviewing or investigating any of the plaintiffs for alleged fraud based on the 1977 computer match and from initiating any recoupment action, except upon certain stated conditions. In view of the extensive briefs filed by both parties and the numerous supporting and opposing affidavits, we conclude that a further hearing would not assist us in resolving the issues. We grant plaintiffs' motion for a preliminary injunction by continuing in effect our April 3, 1979 Temporary Restraining Order dated April 5, 1979, as supplemented in our June 11, 1979 Supplemental Restraining Order and as modified by our July 3, 1979 order, as a preliminary injunction, hereto attached as Appendix A. Insofar as plaintiffs' motion requests preliminary relief not contained in the aforementioned orders of this court, that relief is denied.

*Jurisdiction*

Although defendants have not challenged our jurisdiction, we should address the issue *sua sponte*, especially in view of *Chapman v. Houston Welfare Rights Org.*, —— U.S. ——, 99 S.Ct. 1905, 60 L.Ed.2d 508, decided by the United States Supreme Court on May 4, 1979. Plaintiffs predicate federal jurisdiction on 28 U.S.C. §§ 1343(3) and 1343(4) and jurisdiction over the state law claims as pendent to the federal claims. The Court in *Chapman* concluded that neither § 1343(3) nor § 1343(4) confers jurisdiction to entertain a claim that state action violates the Social Security Act.

■ However, plaintiffs' complaint alleges a deprivation under color of state law of constitutional rights, *viz.*, rights under the First, Fourth, Fifth and Fourteenth Amendments. Because at least the Fifth and Fourteenth Amendment claims are not patently without merit, plainly frivolous, or clearly foreclosed by prior decisions, we have pendent jurisdiction to decide the claims based on the Social Security Act and federal regulations. *Hagans v. Lavine*, 1973, 415 U.S. 528, 536, 537, 94 S.Ct. 1372, 39 L.Ed.2d 577. Moreover, since both state law and federal law claims derive from a common nucleus of operative fact, we may, and we do, exercise pendent jurisdiction over the state claims. *United Mine Workers v. Gibbs*, 1966, 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218. We need not, therefore, determine whether plaintiffs individually meet the amount in controversy requirement of 28 U.S.C. § 1331 and thus whether § 1331 offers an independent jurisdictional base to decide the Social Security Act claims.

*Findings of Fact*

Our statement of the facts dictated at the April 3, 1979 hearing will serve as the findings of fact required by Fed.R.Civ.P., Rule 52, up to the date of that hearing. In addition we find the following:

1. On or about April 17, 1979, after issuance of our April 3, 1979 Temporary Restraining Order, the Department of Public Welfare sent Memorandum AP–79–27 to Assistance Payments Staff informing all staff of the substance of our Order and setting forth procedures to be followed to restore cases to the status quo ante existing prior to the March 19, 1979 notice and related interviewing process. A copy of AP–79–27 is attached to Defendants' Memorandum of Law in Opposition to Plaintiffs' Motion for Preliminary Injunction as exhibit "D".

2. On May 8, 1979, pursuant to our April 3, 1979 Temporary Restraining Order, ¶ 1.b, defendants mailed to each plaintiff a notice intended to undo the effect of the March 19, 1979 notice and interviewing process. A copy of the May 8 "curative" notice is attached to Defendants' Memorandum of Law as exhibit "A".

3. About May 17, 1979, defendants conducted a review of each plaintiff's file in order to determine which plaintiffs would be subject to priority redeterminations and/or fraud referrals. The procedures and standards followed in this "desk review" are contained in AP–79–33 to Assistance Payments Staff attached to Defendants' Memorandum as exhibit "B". This desk review resulted in reducing the total number of recipients subject to redetermination and possible fraud referral to about 6,000.

4. About June 14, 1979 the Department of Public Welfare issued to its Assistance Payments Staff Memorandum AP–79–43 outlining the procedures to be followed in determining the group of about 6,000 recipients who remained after the desk review and in referring members of this group for fraud investigations. A copy of AP–79–43 is attached to Defendants' Memorandum of Law as exhibit "C".

5. Also about June 14, 1979 new redetermination interview notices were mailed to those recipients designated by the AP–79–43 memorandum. A copy of the redetermination interview notice is included with memorandum AP–79–43 as Attachment 1 in exhibit "C" to Defendants' Memorandum of Law.

6. The Bureau of Welfare Auditing informed all supervisors by memo dated July 10, 1979 that the Department of Public Welfare would remove all information from DPW case files obtained from client contact related to the computer match. Moreover, by Memorandum AP/ADM–79–28 dated July 16, 1979, the Department of Public Welfare directed all Associate Regional Managers for Assistance Payments, RDCU Managers, CSAO/WSO Directors, and Assistant Directors for Assistance Payments to remove temporarily from a case file any information obtained as a result of client contact related to the Earnings Match before BWA investigators review the file. The BWA Memo is attached to Defendants' Memorandum of Law as exhibit "I" and AP/ADM–79–28 is attached as exhibit "H".

7. In response to our July 3, 1979 Order modifying our April, 3, 1979 Temporary Restraining Order, defendants have drafted new Bureau of Welfare auditing notices of fraud investigation interviews specifying that "[y]our lack of cooperation with this investigation will not effect [sic] your current eligibility for assistance." A copy of this notice is attached to Defendants' Memorandum of Law as exhibit "K".

8. Defendants' efforts to separate DPW and BWA activities and records and the very limited scope of examination in DPW interviews demonstrate their good faith in isolating eligibility redeterminations from fraud investigations.

*Conclusions of Law*

Our conclusions of law include those dictated at the April 13, 1979 hearing and those contained in subsequent orders of this court. Plaintiffs raise a number of additional arguments in support of their request for preliminary relief, the most important of which we address below. The following discussion divides the arguments into two categories, those challenging the conduct of eligibility redeterminations and those challenging the fraud investigations.

### DPW Eligibility Redeterminations

Plaintiffs continue to insist that, in spite of the substantial modifications that defendants have made in their procedures and the mailing of the May 8, 1979 "curative" notice, defendants are still conducting fraud investigations under the guise of eligibility redeterminations. We do not agree. Contrary to plaintiffs' claim at page 3 of their Reply Memorandum in support of Motion for Preliminary Injunction, the eligibility redeterminations plainly serve a purpose different from that served by fraud investigations. The state has a strong interest not only in identifying and deterring welfare fraud but also in allocating its limited welfare resources to those most in need of assistance. *See, New York Dept. of Social Services v. Dublino*, 1973, 413 U.S. 405, 413, 93 S.Ct. 2507, 37 L.Ed.2d 688. Eligibility redeterminations are the primary vehicle for promoting this allocation goal.

Plaintiffs point out that nearly all remaining 6000 recipients who are subject to eligibility redeterminations are at the same time the focus of possible fraud investigations and that, on defendants' instructions in AP–79–33 and AP–79–43 as well as the affidavit of Ralph Muller, DPW Deputy Commissioner, it appears that fraud referral forms, so-called FR–1 forms, were prepared for each recipient before any eligibility redeterminations took place. Rather than transforming redeterminations into fraud investigations, the prior preparation of FR–1 forms after a case file review serves further to separate DPW and BWA functions by ensuring that fraud referrals are based only upon information obtained independently of redetermination interviews. Under normal circumstances eligibility redeterminations are not necessarily disguised fraud investigations, *United States v. McDaniels*, E.D.La.1973, 370 F.Supp. 293, 296. In our opinion, the fact that interviewees might also be the focus of a potential fraud investigation prior to redetermination in this case does not change the complexion of the interview process, where the recipient may only be questioned about current employment and income, a social worker may not initiate a collateral investigation without the recipient's consent, and DPW and BWA activities are structurally isolated to the extent they are in this case. *Cf., United States v. Bray*, 10 Cir. 1976, 546 F.2d 851, 854–55; *United States v. Bloom*, E.D.Pa.1978, 450 F.Supp. 323, 330–31.

The statements to the contrary by Steve Kane, DPW Assistant Commissioner for Assistance Payments, at his June 4 and June 11, 1979 depositions are contradicted by the DPW memoranda outlining the redetermination and fraud referral procedures and are expressly rebutted by Mr. Kane's July 2, 1979 affidavit together with the July 2, 1979 affidavit of Ralph Muller. Moreover, the affidavits of recipients indicating possible abuses of the established procedure by some social workers are not so numerous, in view of the nearly 6,000 recipients subject to interviews, to suggest that these relatively few instances of noncompliance reflect an official DPW policy at variance with published procedures. Violations of DPW rules and regulations by social workers causing substantial injury to the interviewee either in the form of possibly unauthorized termination of welfare assistance or increased risk of self-incrimination in a subsequent trial for fraud may be cured by means of the DPW pre-termination hearing and appeal procedures or by a motion to suppress at the criminal trial, if that is appropriate, *cf., United States v. Caceres*, 1979, 440 U.S. 741, 99 S.Ct. 1465, 59 L.Ed.2d 733.

Plaintiffs also challenge the propriety of conducting redeterminations of current eligibility on the basis of information about a welfare recipient's employment during the last quarter of 1977, about eighteen months prior to his redetermination interview. Based on the June 7, 1979 affidavit of Michael J. Piore and the May 30, 1979 affidavit of Bennett Harrison, both professors of economics specializing in labor economics and employment, plaintiffs contend that because of the high job turnover among the working poor, the chance of a welfare recipient currently working for the employer identified in the 1977 computer match is extremely remote, too small in fact for the

computer match information to serve as the trigger for a "special" eligibility redetermination. 45 C.F.R. § 206.10(a)(9) requires in relevant part that "eligibility will be considered or redetermined: . . . (ii) promptly, after a report is obtained which *indicates* changes in the individual's circumstances that *may affect* the amount of assistance to which he is entitled or may make him ineligible, and (iii) periodically, *within agency-established time standards*, but not less frequently than 6 months in AFDC . . . ." (emphasis added). And the corresponding state regulation, 6 CHSR III § 303.52, provides that "continuing eligibility of each recipient shall be determined: (a) at least every six months or *more frequently as required* . . . [or] (c) when a CSA/WSO obtains information which *indicates* a change in circumstances which *may affect* eligibility or the amount of assistance." (Emphasis added.)

■ It is our opinion that the computer match information demonstrating a substantial likelihood of unreported employment in the last quarter of 1977 "indicates" a relevant change in the recipient's current circumstances. Statistical studies provide only limited information. In particular, Mr. Harrison's study, upon which plaintiffs rely, cannot *prove* that there is no chance that a welfare recipient who worked for an employer in late 1977 is still working for the same employer; there is certainly some probability of continuing employment. Moreover, without additional information about the distribution of the data regarding length of employment, not just the averages, we are unable to judge the true significance of Mr. Harrison's results. Indeed, Mr. Piore states in paragraph 5.c of his June 7, 1979 affidavit that "Harrison's results suggest the chances that somebody on welfare in 1977 would be employed in 1979 are about 60%." A sixty percent likelihood is plainly sufficient to "indicate" current unreported employment.

Finally, although we do not suggest that the fact that a recipient may have withheld information in late 1977 proves that he certainly must be withholding information about current employment, we cannot ignore this significant possibility, especially in view of the increased risk of fraud prosecution that might result from a later admission of employment that had previously been withheld. Fear of prosecution would doubtless also make a recipient reluctant to admit current employment during intervening periodic redetermination interviews. Under these circumstances the computer information is sufficiently relevant to current circumstances to trigger a redetermination pursuant to 45 C.F.R. § 206.10(a)(9)(ii) and 6 CHSR III § 303.52(c).

■ However, even if the requirements of § 206.10(a)(9)(ii) and § 303.52(c) were not met by the computer match, redeterminations would nevertheless be proper under 6 CHSR III § 303.52(a). This regulation gives a great deal of latitude to DPW officials to conduct eligibility redeterminations "as required." Neither the federal nor the state regulations impose an outer limit on the frequency of redeterminations. They specify only when an eligibility redetermination must, not may, be done. Of course, a recipient's being subjected to very frequent eligibility redeterminations without any reasonable basis would present serious Fourteenth Amendment due process and equal protection issues; and less frequent, but groundless, redeterminations might violate 45 C.F.R. § 206.10(a)(10) as being inconsistent with the purposes of the Act. In the instant case, however, there appears to be a reasonable basis to suspect current unreported employment, and plaintiffs have offered no evidence of harassment in the form of repeated redetermination interviews.[1]

In addition to attacking the entire process, plaintiffs also challenge several specific aspects of the redetermination procedures.

---

1. Since the Food Stamp and computer match redetermination interviews have been designated priority tasks for DPW social workers and since these court proceedings postponed the redetermination interviews at least three months, from March 1979 to June 1979, many plaintiffs will now be subject to their regular six-month eligibility redetermination in any event. 45 C.F.R. § 206.10(a)(9)(iii).

In particular they argue: (1) that requiring collateral verification of current nonemployment violates 6 CHSR III § 302.16; (2) that the Fifth Amendment privilege against self-incrimination is infringed by requiring recipients to cooperate in providing verification or face termination of AFDC; (3) that terminating assistance for unreasonable failure to cooperate violates the Social Security Act; and (4) that recipient interviewees must be given prior notice of their Fifth Amendment privilege, the availability of class counsel, and their rights as working recipients. We will treat each argument in turn.

 DPW procedures require a recipient who denies that he is employed to verify that he is not currently employed by the employer named in the 1977 computer match. Plaintiffs contend that 6 CHSR III § 302.16, which makes the individual's statements sufficient to establish eligibility "provided the information is complete, consistent and there is no contradictory evidence," prohibits this collateral verification requirement. Plaintiffs reason because of the low likelihood of 1979 employment with a 1977 employer, evidence of 1977 unreported employment cannot "contradict" a flat denial of current employment. For essentially the same reasons discussed *ante*, we disagree. There is at least some likelihood of employment continuing for eighteen months. That likelihood coupled with the reasonable inference that the recipient may have withheld information in the past gives reason to suspect current employment in spite of the recipient's denial.[2] Hence there is contradictory evidence justifying collateral verification under § 302.16.

 Plaintiffs' second argument, that a recipient's Fifth Amendment privilege is vi-

olated by requiring his cooperation under threat of termination of welfare benefits, is equally without merit. 6 CHSR III § 302.-16 requires DPW workers to obtain the recipient's consent before making a collateral contact to secure additional evidence and provides that "[a]pplicant or recipient refusal to agree to needed collateral contact will be cause for denial of assistance." *Accord*, 6 CHSR III § 303.53. DPW intends to rely on this regulation to terminate the assistance of any plaintiff who both refuses to provide information showing that he is not currently employed by the employer listed on the computer match and also refuses to consent to the Department's collateral contact of the employer by letter in order to verify current nonemployment. Department of Public Welfare Memorandum AP–79–43 dated June 14, 1979, at p. 2.

 Plaintiffs' argument is in three parts: (1) information about whether a recipient is currently employed by the employer named in the computer match could provide a link in the chain of evidence needed to convict the recipient of fraud; (2) at least in the circumstances of this case where most recipients subject to eligibility redetermination are also being investigated for fraud, the privilege against coerced self-incrimination guaranteed by the Fifth and Fourteenth Amendments to the United States Constitution prohibits the compelled disclosure of this potentially incriminating information and, therefore, (3) terminating a recipient's assistance for failure to cooperate in providing this information penalizes the exercise of the privilege and is unconstitutional state action under *Garrity v. New Jersey*, 1967, 385 U.S. 493, 87 S.Ct. 616, 17 L.Ed.2d 562 and its progeny.[3] We disagree

---

**2.** We do not hold that computer match data, no matter how stale, can always justify collateral verification. Each case must turn on its own facts. Important factors include the length of time since the period covered by the study and the availability of more current data at the time the computer match is performed.

**3.** Contrary to defendants' assertion, the *Garrity* doctrine is applicable even though in this case recipients are not forced to waive their privilege or waive future immunity. *See, Gardner*

*v. Broderick*, 1968, 392 U.S. 273, 277–78, 88 S.Ct. 1913, 20 L.Ed.2d 1082; *Spevack v. Klein*, 1967, 385 U.S. 511, 87 S.Ct. 625, 17 L.Ed.2d 574. Public officials may be penalized for failure to answer questions specifically, directly and narrowly related to performance of their public duties, so long as they are not also forced to waive their privilege, but as *Spevack*, *supra*, makes clear, other individuals may not be penalized for exercising the privilege in the first place.

for two reasons. First, the Fifth Amendment privilege is not violated by mandatory self-reporting essential to fulfillment of the objectives of a regulatory statute where disclosures are not extracted from a highly selective group inherently suspect of criminal activities but rather apply to the general public and to activities that are generally lawful and where the possibility of incrimination is not substantial. *California v. Byers*, 1971, 402 U.S. 424, 91 S.Ct. 1535, 29 L.Ed.2d 9; *United States v. Stirling*, 2 Cir. 1978, 571 F.2d 708, 727–28. All of these conditions are met by the verification requirement in this case. It is essential to redetermining eligibility and thus to allocating scarce welfare resources fairly; the welfare assistance field is not one "permeated with criminal statutes," *Byers, supra*, 402 U.S. at 430, 91 S.Ct. 1535, 1539; the self-reporting requirement serves a regulatory, noncriminal purpose and AFDC recipients are not "a highly selective group inherently suspect of criminal activities." The state's regulatory interest is, therefore, compelling.

■ Furthermore, the risk of self-incrimination is insubstantial, not "real and appreciable." *See, Zicarelli v. New Jersey Investigation Comm'n*, 1972, 406 U.S. 472, 478, 92 S.Ct. 1670, 32 L.Ed.2d 234; *United States v. Sahadi*, 2 Cir. 1977, 555 F.2d 23. Although information that one is currently employed by the computer match employer standing alone is not incriminatory since disclosure of the information belies any possible fraud, the identification of a current employer may serve as the starting point of an investigation leading to a fraud prosecution for failing to report income from that employer at an earlier date. In addition plaintiffs suggest that evidence indicating current employment by the identified 1977 employer will be used as a factor in selecting FR–1 forms for referral to the BWA. Defendants dispute this latter suggestion, arguing that all FR–1 forms will be referred, with only the time of referral being determined by the availability of BWA resources. In any event, the Fifth Amendment privilege only protects an individual from being compelled to supply evidence or leads to evidence that might be used against him in a criminal case; it does not protect him from having his compelled disclosures used as factors in a decision about whether to commence a criminal investigation.

■ The risk of information about current employment being used as a link in the chain of evidence leading to conviction for current fraud is reduced to insubstantial proportions by the DPW's procedure of removing from a recipient's file all information obtained as a result of the eligibility redetermination interview before review by BWA fraud investigators. Prosecutors may still have access to this information, but prosecutors would almost certainly have an independent source for verification of current employment by the computer match employer. BWA fraud investigators, not hampered by the collateral contact rule; *see, United States v. McDaniels, supra*, at 295; BWA Reg. 4.1; will routinely inquire of the identified employer and pass the information on to the prosecutor when a case is referred. Hence, the risk of incrimination is insubstantial.

Plaintiffs contend that this case is not controlled by *Byers* because the approximately 6,000 welfare recipients up for redetermination are "a highly selective group inherently suspect of criminal activities," citing *Marchetti v. United States*, 1968, 390 U.S. 39, 88 S.Ct. 697, 19 L.Ed.2d 889. In *Marchetti*, gamblers were forced to report current income from illegal gambling operations for purposes of assessing a wagering tax without any assurance that the incriminatory information would not be made available to prosecutors. The disclosure requirement applied only in an area "permeated with criminal statutes" and only to a group inherently suspect of criminal activity. *Byers, supra*. That area is far removed from this case.

■ A second, independent reason for our conclusion is that termination of assistance for failure to cooperate in providing verification does not offend the Fifth Amendment. *Garrity, supra*, and *Spevack, supra*, do not apply to this case because the interviewee recipient has an alternative not available to appellants in those cases: he

may authorize the social worker's collateral contact so that the DPW may obtain the information itself. Giving one's consent to a collateral contact with an employer to obtain information from corporate records, does not implicate the Fifth Amendment privilege at all. If the DPW requested the verification directly from the named employer, there would be no Fifth Amendment problem whatsoever. In this case, the only involvement required of the recipient is his consent to the collateral contact. But this consent is neither "testimonial" nor "communicative", *Schmerber v. California*, 1966, 384 U.S. 757, 764, 86 S.Ct. 1826, 16 L.Ed.2d 908. By consenting, the recipient does not in any way authenticate the information obtained from the employer, *see, Andresen v. Maryland*, 1976, 427 U.S. 463, 474, 96 S.Ct. 2737, 49 L.Ed.2d 627; the documents can be authenticated at trial without any assistance from the recipient. The recipients compelled consent in this case is no different from a defendant's consent to a search of his home, which, standing alone, does not implicate the Fifth Amendment privilege requiring prior *Miranda* warnings. *Smith v. Wainwright*, 5 Cir. 1978, 581 F.2d 1149, 1152; *United States v. Lemon*, 9 Cir. 1977, 550 F.2d 467, 472; *United States v. Faruolo*, 2 Cir. 1974, 506 F.2d 490, 495; *United States ex rel. Carbone v. Manson*, D.Conn.1978, 447 F.Supp. 611, 619–20. Thus, because in this case the recipient has an alternative to self-incrimination, *Spevack, supra*, does not prevent termination of a recipient's assistance for failure to cooperate.

▇▇▇▇ Plaintiffs also argue that terminating AFDC for unreasonable failure to cooperate by refusing to consent to a collateral contact imposes an eligibility requirement not authorized by the Social Security Act and thus violates *inter alia* 42 U.S.C. §§ 606(a) and 602(a)(10). Plaintiffs cite a number of cases declaring unlawful state-imposed conditions unrelated to the ascertainment of current eligibility or creating irrebuttable presumptions of current income not based on actual facts about the recipient's situation. *E. g., King v. Smith,*

1968, 392 U.S. 309, 88 S.Ct. 2128, 20 L.Ed.2d 1118; *Lascaris v. Shirley*, 1975, 420 U.S. 730, 95 S.Ct. 1190, 43 L.Ed.2d 583; *Udina v. Walsh*, D.Mo.1977, 440 F.Supp. 1151; *Rosen v. Hursh*, 8 Cir. 1972, 464 F.2d 731. As the court in *Grow v. Smith*, 9 Cir. 1975, 511 F.2d 1146, pointed out at 1148–49, a requirement of cooperation in providing the minimal information necessary to establish dependency and current need, unlike the conditions in *Lascaris* and *Rosen*, relates only to identifying current circumstances, not to developing future income possibilities. *See, Rosen, supra* at 734. *Grow* upheld the termination of individuals from the AFDC program who had refused to provide information about absent parents or assist in support or filiation proceedings, reasoning that such cooperation was necessary to enforce an existing support obligation. The court concluded:

> The state may require the production of such minimal information in order to determine actual needs of the family unit. . . . This regulation is within "the legitimate sphere of state administration" supplementing the regulations of the federal government.

*Id.,* at 1149; *see,* 45 C.F.R. § 233.-10(a)(1)(iii)(B); *cf., Wyman v. James,* 1971, 400 U.S. 309, 91 S.Ct. 381, 27 L.Ed.2d 408; *Rush v. Smith,* 2 Cir. 1978, 573 F.2d 110; *Taylor v. Martin,* N.D.Cal.1971, 330 F.Supp. 85, 89 n. 5.

Moreover, mandatory cooperation applies generally to all AFDC recipients, not just plaintiffs, and AFDC assistance is terminated in order to encourage that cooperation, not on the basis of a presumption that the recipient has unreported income, and §§ 302.16 and 303.53 authorize a reasonable method to promote a legitimate goal of the AFDC program. This distinguishes the instant case from *Boucher v. Minter,* D.Mass. 1972, 349 F.Supp. 1240.

▇▇▇▇ The only source of this consent requirement is state regulation. Neither the Social Security Act nor federal regulations bar nonconsensual collateral contacts during eligibility redeterminations.[4] The

---

**4.** Federal regulations in the past required consent before a collateral contact could be made,

45 C.F.R. § 206.10(a)(12)(iii)(a), and authorized termination of assistance for refusal to consent,

purpose of 6 CHSR III §§ 302.16, 303.52 is to protect the recipient's privacy by giving him a choice whether to allow an investigation into aspects of his private life. *Wyman, supra,* 400 U.S. at 321, 91 S.Ct. 381; *McDaniels, supra,* at 295. Of course, an investigation is improper if it invades constitutionally protected privacy interests or seeks irrelevant information; however, if he chooses to prohibit a proper investigation, the recipient must do so at a cost, the loss of his AFDC benefits. We will not hold unlawful under the Social Security Act compelled cooperation necessary to establish current eligibility when the cooperation amounts only to giving consent for a collateral investigation which under federal law could be conducted without the recipient's consent in any event.

 Plaintiffs' fourth argument, that recipients must be given notice of their privilege against self-incrimination, of the ·availability of class counsel, and of their rights as working recipients prior to any redetermination interview is wholly without merit. Even if the privilege were available to plaintiffs during redetermination interviews, advance warning of the privilege against self-incrimination is not required by the Fifth and Fourteenth Amendments because the redetermination interview is not "custodial" interrogation within the meaning of *Miranda v. Arizona,* 1966, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694. *Oregon v. Mathiason,* 1977, 429 U.S. 492, 495, 97 S.Ct. 711, 50 L.Ed.2d 714 (*per curiam*); *Beckwith v. United States,* 1976, 425 U.S. 341, 96 S.Ct. 1612, 48 L.Ed.2d 1; *United States v. Mapp,* 7 Cir. 1977, 561 F.2d 685, 688; *Borodine v. Douzanis,* D.Mass.1978, 455 F.Supp. 1022. The interview generally takes place at the recipient's home in familiar surroundings, *see* 6 CHSR III § 303.52, and the recipient is free to leave or to request that the social worker leave and reschedule the interview for another time. *Compare, Borodine, supra,* at 1027. Furthermore no federal or state statute or regulation known to us requires these advance warnings in redetermination interviews. Recipients also have no right under the Constitution, statute or regulation to have counsel present at the interview. Because the interview is noncustodial, *Miranda* does not guarantee a right to counsel, and because the interview is not a "critical stage" of criminal prosecution, no Sixth Amendment right to counsel attaches. *United States v. Wade,* 1967, 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149; *United States v. Nashawaty,* 1 Cir. 1978, 571 F.2d 71, 74–75. The defendants are not obligated to give prior warning of a right plaintiffs do not enjoy. Plaintiffs, however, appeal to our discretion under Fed.R.Civ.P. Rule 23(d), reasoning that notice to class members of the availability of class counsel is needed so that class counsel can supervise compliance with our decree by being present at redetermination interviews. Assuming that the court does certify this lawsuit as a class action, it is our opinion that such notice would be inappropriate where defendants' published procedures on their face comply with our decree and where there is no evidence of widespread and significant departures from these procedures. In the cases plaintiffs cite, courts authorized notice for only very limited purposes, not in order to permit one party to supervise compliance with the terms of a decree.

> 45 C.F.R. § 206.10(a)(12)(iii)(c). These regulations were deleted in 1973. 38 Fed.Reg. 22009 (1973). This deletion was accompanied by the addition of 45 C.F.R. § 206.10(a)(10) generally requiring that eligibility standards and verification methods comply with the program's objectives and all legal requirements. This modification appears to have been undertaken with the understanding that states would develop methods of verifying eligibility subject to the general constraints of § 206.10(a)(10). *See,* 38 Fed. Reg. 22006–22007.

> The interpretation of a statute by the agency delegated the authority to enforce its terms is entitled to great weight. *Red Lion Broadcasting Co. v. F. C. C.,* 1969, 395 U.S. 367, 381, 89 S.Ct. 1794, 23 L.Ed.2d 371. Therefore, the fact that the regulations had once authorized the very same practice here challenged adds further support to our conclusion that it does not violate the Act, especially in view of the stated reasons behind the 1973 modifications.

Finally, plaintiffs' arguments for requiring advance notice of interviewee's rights as working welfare recipients are not persuasive. Defendants publish an informational pamphlet "Getting What You Need: A Handbook of Services for Low Income Women in Massachusetts", Ex. 14 to Steve Kane deposition, which pamphlet outlines the rights of working welfare recipients. Although the pamphlet is in short supply, Kane deposition at 2–53, it is currently being rewritten and the new version will be published and distributed. Meanwhile, copies of the current pamphlet are available at welfare offices. This satisfies the requirements of 45 C.F.R. § 206.-10(a)(2)(i), assuming defendants publish the new pamphlet in quantities adequate for general distribution. And the Fourteenth Amendment due process clause requires no more. *Compare, Carey v. Quern,* 7 Cir. 1978, 588 F.2d 230, 232; *Baker-Chaput v. Cammett,* D.N.H.1976, 406 F.Supp. 1134.

*BWA Fraud Investigations*

Plaintiffs mount a five-prong attack on BWA fraud investigations. They argue that defendants are obligated by the terms of 45 C.F.R. § 235.110(a) to (1) publish methods and criteria for identifying fraud prior to making fraud referrals; (2) to provide advance written notice of a recipient's rights to counsel and to remain silent and of the possible criminal consequences of his cooperation during the interview; (3) to give interviewees advance notice of the specific allegations of fraud that will be the subject of the interview; (4) to establish procedures to provide appointed counsel to those recipients who request it prior to commencing any fraud interviews; and (5) to develop "procedures" for referring cases to a prosecutor in accordance with 45 C.F.R. § 235.110(a)(2) prior to making any such referrals. We discuss each contention briefly.

Plaintiffs' first point cannot withstand a close examination of the relevant regulation. 45 C.F.R. § 235.110(a)(1) requires that a state plan must provide "(a) that the state agency will establish and maintain: (1) methods and criteria for identifying situations in which a question of fraud in the program may exist." The computer match together with the subsequent case file review is one such "method" and the standards for preparing FR–1 forms outlined at page 2 of AP–79–33 constitute "criteria." Publication of this method and these criteria in advance of the computer match itself, although advisable, is not required by § 235.110(a)(1), nor any other regulation or statutory or constitutional provision that plaintiffs cite. Moreover, it is doubtful whether plaintiffs have standing to complain of a violation of § 235.110(a)(1), since the duties imposed on the state by that regulation appear to be for the benefit of the federal government as a participant in the AFDC program, not for the benefit of individual recipients. *See, Warth v. Seldin,* 1975, 422 U.S. 490, 498–502, 95 S.Ct. 2197, 45 L.Ed.2d 343; *cf., United States v. Mapp,* 7 Cir. 1977, 561 F.2d 685, 690; *see generally, Caceres, supra,* 440 U.S. 741, 99 S.Ct. 1465.

Plaintiffs also seek to enjoin all fraud investigations until defendants delineate more specific criteria for identifying a "question of fraud" according to the elements of welfare fraud under state law. § 235.110(a)(1) speaks generally of "situations in which a question of fraud *may* exist" (emphasis added). This language does not appear on its face to require more rigorous standards than defendants have articulated in AP–79–33. *Cf., Raper v. Lucey,* 1 Cir. 1973, 488 F.2d 748, 753 n. 5. Indeed, it would be very difficult for a social worker to screen cases more carefully based on the very limited information about current employment obtained from the redetermination interview and collateral contacts, if any. Fraud investigations instigated only on the basis of information gleaned from computer match studies and case file reviews like those in the instant case are not without precedent. *See, e. g., Greater Cleveland Wel. Rights Org. v. Bauer,* N.D. Ohio 1978, 462 F.Supp. 1313; *Carleson v. Golden Gate Welfare Rights Org.,* 1972, 27 Cal.App.3d 1, 103 Cal.Rptr. 824.

Plaintiffs' second contention is also unavailing. Because the fraud investi-

gation interviews are noncustodial, *Miranda* warnings are not required by the Constitution. *Beckwith, supra.* Plaintiffs, however, direct our attention to BWA Regulations 4.16 and 4.17, which require oral *Miranda*-type warnings prior to interrogation and require that an interview not proceed until the interviewee has knowingly and intelligently waived his rights. Plaintiffs insist that the coercive atmosphere created by the March 19, 1979 notice and accompanying publicity has caused feelings of fear and intimidation that continue to the present and that this pressure prevents interviewees from exercising a "knowing" and "intelligent" choice about whether to waive their rights under § 4.16. In view of the "curative" notice expressly retracting the March 19, 1979 notice and interviewing process and in view of the new fraud interview notice which notifies the interviewee of his right to have counsel present and that he need not cooperate with the investigation, it is our opinion that interviewees at this time are able knowingly and intelligently to decide whether to waive their rights. If in individual cases, an interviewee believes that his waiver was not freely given, he may, of course, move to suppress any incriminating evidence at trial. *See, Caceres, supra,* 440 U.S. 741, 99 S.Ct. 1465.

▮ Plaintiffs' third argument misconstrues the nature of the fraud interview. Plaintiffs are not "charged" with any criminal violation; they are "suspected" of criminal fraud. The proposed interview notice explains the computer match in general terms, informs the interviewee that the purpose of the interview is to determine whether he "possibly failed to report income while receiving assistance from the DPW", and specifically notes that the "BWA investigates possible fraud . . ." Although it could be more explicit, this written description is adequate to inform the interviewee of the reasons for and the subject of the interview so that he may decide whether or not to cooperate. Moreover, if during the scheduled interview he decides, on the basis of additional information, that some particular evidence he possesses might be helpful in indicating ab-

sence of fraud, he may arrange to give that information to the investigator at a later date. The recipient does not stand accused with only one opportunity to clear himself of the charges. The interview is neither a criminal trial nor an administrative-type hearing preliminary to a deprivation of a legally protected liberty or property interest. Thus *Dunn v. Tyler Independent School District,* 5 Cir. 1972, 460 F.2d 137, cited by plaintiffs, is inapposite.

*McKenney v. Commission on Judicial Conduct,* 1979 Mass., 388 N.E.2d 666, also addresses a situation different from that confronting plaintiffs here. In that case, the court held that the Massachusetts statute outlining the procedures for filing citizen complaints with the Commission about judicial conduct required that charges be specific enough for the "accused" judge to be able to respond and the Commission to be able to decide, based on the complaint and the response, whether or not to pursue an investigation. Unlike the statute in *McKenney,* no welfare statute or regulation gives the recipient a right to respond to allegations of fraud or a right to an interview. And an interview is scheduled after, not before, the decision to proceed with a fraud investigation. If an interview is scheduled, the interviewee is entitled only to a general explanation of the reason for the interview, *see,* BWA Regulation 4.18.1, and such an explanation is provided by defendants' proposed fraud interview notice form.

▮ Contrary to the premise of plaintiffs' fourth contention, BWA Regulation 4.16(3) does not impose a duty on the BWA to provide appointed counsel to indigents who cannot afford their own. Section 4.16(3) merely requires that if an indigent desires appointed counsel, "no interrogation or questioning shall take place until an attorney is appointed for him . . . ." This language speaks in the passive, not the active, voice. Although it would be advisable for fraud interviewers to suggest possible sources of low-cost legal assistance, this regulation does not require them to give even that advice.

Plaintiffs fifth and final argument challenges the BWA's referral of cases to the prosecutor in the absence of published "procedures developed in cooperation with the state's legal authorities for referring to law enforcement officials situations in which there is *valid reason* to *suspect* that fraud has been practiced." 45 C.F.R. § 235.110(a)(2) (emphasis added). As with § 235.110(a)(1), we question whether the state duties imposed by this regulation run to the benefit of recipients. *See, McDaniels, supra,* at 296. Plaintiffs' Motion for a Preliminary Injunction does not request that referral of cases to prosecutors be enjoined until criteria governing referral are promulgated. Assuming, however, that plaintiffs amend their motion to include this additional relief, we would deny it on the ground that plaintiffs have not demonstrated a probability of success on the merits. Although § 235.110(a)(2) contemplates that cases will not be referred if there is no "valid reason" to suspect fraud, *McDaniels, supra,* at 296, it does not appear to require that criteria be published as well. The federal regulations protect the AFDC recipient by requiring the state to designate an official responsible for fraud referrals to prosecutors. 45 C.F.R. § 235.110(c); *McDaniels, supra,* at 296–297. Indeed, the BWA shares the same interest as the prosecutor in an ad hoc approach to decisions about whether there is a "valid reason" to suspect fraud. *See generally, Securities Comm'n v. Chenery Corp.,* 1947, 332 U.S. 194, 67 S.Ct. 1575, 91 L.Ed. 1995. It might be quite difficult to articulate an all-inclusive set of "valid reasons" short of a statement of the elements of fraud under Massachusetts law and perhaps a requirement that probable cause exist as to each element before referral. *Compare, Bauer, supra,* at 1317. We do not think that the overly general language of § 235.110(a)(2) requires even this much.

*Conclusion*

Based on the foregoing, we grant plaintiffs' motion for a preliminary injunction only to the extent that the requested relief has already been granted by our prior orders. The motion is denied in all other respects on the ground that plaintiffs have failed to demonstrate a probability of success on the merits.

## APPENDIX A

### PRELIMINARY INJUNCTION

GARRITY, District Judge.

Upon consideration of memoranda of law, affidavits and exhibits, and on the basis of the findings and conclusions of the court announced April 3, 1979 and of the orders of the court entered April 5, June 11 and July 3, 1979, the defendants, their agents and servants are restrained until further order of this court from:

1. Further interviewing any members of the plaintiff class until defendants fully comply with all regulations and procedures of the Bureau of Welfare Auditing for investigating alleged fraud, or procedures of the Department of Public Welfare for redetermination of current eligibility;

a. prior to the Bureau of Welfare Auditing again commencing interviews of any members of the plaintiff class, the BWA shall mail revised notices to plaintiffs which rescind all previous notices and state that lack of cooperation with any fraud investigation does not affect current eligibility for welfare assistance, except that where a sanction for failure to cooperate is authorized by normal BWA policies and properly issued regulations and is otherwise consistent with all legal requirements, the notice may contain a reference to that sanction.

b. prior to the Department of Public Welfare commencing redetermination reviews of current eligibility for welfare assistance of any members of the plaintiff class, it shall determine which members of plaintiff class are due for redetermination, and shall send notices to each such recipient rescinding the notice of March 19, 1979 and explaining in substance that the purpose of the interview is to redetermine current eligibility only, that no inquiry will be made at the interview into wages earned before 1979 and that the sole documentation relating to verification of wages the recipient must

bring to the interview is verification of the previous five weeks of earnings, if any;

2. Failing to vacate or cease all termination, suspension, reduction or other adverse action, including any recoupment action or referral to the Bureau of Welfare Auditing, based upon information from, or actions taken by, any members of plaintiff class subsequent to the March 19, 1979 notice, with respect to those members of the plaintiff class who have been interviewed, terminated, or who have closed out their cases, *provided* that defendants may proceed to redetermine the current eligibility of the members of the plaintiff class or close their cases in accordance with normal procedures for redeterminations and case closings, and may require the cooperation of members of the plaintiff class in verifying any assertion that they were not currently employed at the time of the redetermination interview

by the employer(s) named on the Computer Match, after adequate notice to plaintiffs of their rights pursuant to this court order; and

3. Failing to return to each member of the plaintiff class, or in the event that proves impossible to destroy, any information obtained from her or him in connection with the March 19, 1979 notice and related interviewing process which might be used against the recipient in a criminal proceeding in violation of her right against self-incrimination under the Fifth Amendment to the United States Constitution.

Plaintiffs are exempted from the bonding requirements of Rule 65(c).

Dated: September 10, 1979.