**UNITED STATES of America, Appellee,**

v.

**Zeev DICHNE, Defendant-Appellant.**

**No. 243, Docket 79–1230.**

United States Court of Appeals,
Second Circuit.

Argued Sept. 27, 1979.

Decided Nov. 27, 1979.

Certiorari Denied March 17, 1980.
See 100 S.Ct. 1314.

---

Jerry L. Siegel, Asst. U. S. Atty., Southern District of New York, New York City (Robert B. Fiske, Jr., U. S. Atty., David C. Patterson, Asst. U. S. Atty., New York City, of counsel), for appellee.

John S. Martin, Jr., New York City (Schulte & McGoldrick, Stacey J. Moritz,

New York City, of counsel), for defendant-appellant.

Before MOORE, OAKES and NEWMAN, Circuit Judges.

MOORE, Circuit Judge:

Zeev Dichne appeals his conviction in the United States District Court for the Southern District of New York (Honorable Richard Owen, *District Judge*), based upon a non-jury trial and stipulated evidence submitted to the Court. Dichne offered no proof. He was convicted of violating the reporting requirements of what is known as the Bank Secrecy Act (31 U.S.C. § 1051 *et seq.*) (hereinafter the "Act"). The judgment provided for a sentence of eighteen months, three months of which was to be served in jail, the balance suspended with unsupervised probation and a $10,000 fine. Dichne appeals on the following grounds: (1) the Government failed to prove beyond a reasonable doubt that he had knowledge of the reporting requirements of the Act; (2) the reporting provisions of the Act violate his fifth amendment right against self-incrimination; and (3) the District Court committed reversible error when it failed to observe the time provisions of the Speedy Trial Act (18 U.S.C. § 3161 *et seq.*). We affirm the conviction.

## FACTS

Zeev Dichne, Arie Marinsky and Rustamali Tejpar were indicted and charged with conspiracy to evade the foreign reporting requirements of the Act, 31 U.S.C. §§ 1059 and 1101(a), by planning and partially executing a conspiracy to transport approximately $2,000,000 in monetary instruments out of the United States without filing the required currency transaction forms. Because the defendants Marinsky and Tejpar were fugitives at the time of trial, Dichne was the sole defendant.

Prior to trial Dichne moved unsuccessfully to dismiss the indictment against him on the ground that the reporting requirements of the Act violated his fifth amendment right against self-incrimination. Thereafter, the Government moved for an extension of the time limits set forth in the Speedy Trial Act, 18 U.S.C. § 3161(g), on the ground that a principal government witness had himself been indicted and was therefore unavailable to testify. Although Dichne contested this motion, the Court below granted the Government's request and ordered an extension of the relevant time period.

On April 20, 1979, the date set for trial, defendant Dichne waived his right to a jury trial and stipulated to the evidence which the Government would introduce. On the basis of the stipulated evidence, Dichne moved for a judgment of acquittal on the ground that the United States had failed to prove beyond a reasonable doubt that he had notice of the reporting requirements of the Act. The Court denied the defendant's motion and on May 11, 1979 entered a judgment finding the defendant guilty as charged in the indictment.

The stipulated evidence revealed the following: Zeev Dichne was a self-employed export-import and financial broker. In August of 1976, Dichne was introduced to Joseph Hauser, a self-employed insurance salesman who controlled and operated a number of insurance companies involved in providing health care insurance to labor unions. Hauser was interested in transporting out of the United States money apparently stolen from a fund allocated for the payment of health and welfare claims of union members.

Approximately one month later, Dichne, acting on behalf of Hauser, approached a former business associate, Theodore Arnold, in Zurich, Switzerland, and asked him if he knew someone who could secretly move some United States currency from the United States to Switzerland. Arnold thereafter contacted the defendant Tejpar, who in turn contacted an associate of his in New York, one Friedrich Jaegar, and asked if he would be interested in participating in the smuggling transaction. Unbeknownst to the other participants, Jaeger subsequently notified Special Agent John Martinez of the United States Customs Service of the planned transaction.

On October 4, 1976, Jaeger had conversations with Tejpar which were recorded. Jaeger told Tejpar that confirmed cashier's checks drawn on the United Americas Bank in New York would be used to carry out the transaction. Tejpar informed Jaeger that Dichne was representing the organization that wished to move $2,000,000 (the initial amount to be moved) out of the country, and that Dichne would be present in Los Angeles for the transaction. Through further discussion Jaeger and Tejpar agreed that the transaction would be carried out by their accompanying Dichne to the Bank of America in Los Angeles, where $450,000 in cash (the first installment to be moved) would be deposited. Jaeger would then give Dichne three cashier's drafts totalling $450,000 confirmed by the United Americas Bank.

On Tuesday, October 5, Jaeger had three bank drafts made payable to bearer prepared by the United Americas Bank in the amount of $150,000 each. Later that same day Tejpar arrived at the airport in New York and was met there by Jaeger and Special Agent John Martinez, posing as Jaeger's armed bodyguard. Tejpar told Jaeger that Dichne would be the one who would actually carry the checks from Los Angeles to Zurich, Switzerland, where they would be deposited.

The following day, Tejpar, Jaeger and Agent Martinez arrived in Los Angeles and met Dichne, Marinsky, and Hauser. Dichne had arrived in the United States on October 1, 1976, and at that time had filled out a Customs Baggage Declaration upon which he answered "No" in response to the question "Are you or anyone in your party carrying over $5,000 in coin, currency or monetary instruments?"

On the morning of October 6, 1976, Tejpar met with Jaeger and Special Agent Martinez, and informed them that Dichne preferred to use a bank draft drawn on a Los Angeles bank, rather than the cashier's checks from the United Americas Bank which had been planned. Dichne informed Jaeger that the bearer instrument had to be ready at the bank when they deposited the cash. Dichne stated that he did not want to have to wait at the bank for a check to be issued because he did not want any questions asked and did not want to be told that the transaction had to be reported to the Internal Revenue Service.

Jaeger later met with Dichne and Tejpar and told them the transaction was set and that he was going to the bank to open up an account and make arrangements for the check. Dichne wanted the check to be made payable to "Bearer", but when Jaeger informed him that no American bank would do this, it was agreed that the check would be made payable to Tejpar, and that he would immediately endorse it, thus rendering it negotiable, and give it to Dichne.

Jaeger and Special Agent Martinez then proceeded to a local bank where they opened an account and arranged for a $375,000 check to be drawn, payable to Tejpar, upon the deposit later in the day of $400,000 in cash (apparently the other $50,000 in cash was not forthcoming). Dichne produced from his hotel room $400,000 in American currency in denominations of $20, $50 and $100 bills. Later, Dichne, Tejpar, Jaegar and Special Agent Martinez proceeded to the bank where the account had been opened. At the bank the cash was deposited into the newly opened account, and a cashier's check in the amount of $375,000 was received back, payable to "Rustam Tejpar". On Dichne's instructions, Tejpar then endorsed the check in blank and handed it to Dichne, who put it in his pocket.

Later that day Dichne and Marinsky proceeded to the Los Angeles airport where they were met by Hauser. Dichne, Marinsky and Hauser proceeded to the boarding area for a British Airways flight to London. During the time Dichne, Marinsky and Hauser were observed in the departure area, United States Customs Inspector Conrad Millan read an announcement concerning the United States monetary reporting requirements over the public address sys-

tem on four separate occasions.[1] In addition, a number of large color posters explaining the reporting requirements were prominently displayed throughout the departure area.[2] Neither Dichne, Marinsky nor Hauser asked or attempted to ask anyone for the required monetary instrument reporting forms, and no such form was in fact prepared before Dichne, Marinsky and Hauser departed aboard a flight to London. The check was eventually presented for payment at a Swiss Bank.

## I.

■ The Bank Secrecy Act requires that anyone who knowingly transports monetary instruments into or out of the United States in an amount exceeding $5,000 on any one occasion must file the appropriate report. 31 U.S.C. § 1101.[3] Title 31 U.S.C. §§ 1058 and 1059 provide criminal sanctions for the willful violation of any section of the Act, including, *inter alia*, § 1101. Because the language of these sections of the Act imposes criminal liability only upon an individual who *knowingly* transports monetary instru-

ments in *willful* violation of the Act, and because the Act requires the reporting of an otherwise innocent act, it has consistently been held that the Government must prove beyond a reasonable doubt the defendant's "knowledge of the reporting requirement and his specific intent to commit the crime". *United States v. Granda*, 565 F.2d 922, 926 (5th Cir. 1978). *Accord United States v. San Juan*, 545 F.2d 314, 318–19 (2d Cir. 1976); *United States v. Schnaiderman*, 568 F.2d 1208, 1211 (5th Cir. 1978).

■ Appellant argues that the stipulated evidence failed to establish beyond a reasonable doubt that he was aware of the reporting requirements of the Act. Furthermore, Dichne argues that even if he was aware of the general provisions of the Act, the Government failed to establish beyond a reasonable doubt that Dichne had knowledge that the endorsed check for $375,000 required reporting under the Act's definition of "monetary instruments". We find the stipulated evidence sufficiently supports the finding of the District Court

---

1. The form from which the Customs Inspector read contained the following language:

   "NOTICE: If you transport, mail, ship or receive $5000 or more in currency of the United States or any other country, or monetary instruments such as travelers checks, negotiable instruments in bearer form or money orders into or out of the United States, you must file a report with U.S. Customs. Ask a Customs Officer for the form. *Failure to do so can result in civil and criminal penalties.*" (emphasis in original). *See* Appellee's Br. at 10.

2. These posters, measuring 20″ by 13″, were printed and illustrated in red, white and blue, and the figure "$5000" was printed in 2″ high letters. The posters contained language almost identical to that of the form that was read aloud. *See* Appellee's Br. at 11.

3. 31 U.S.C. § 1101 reads as follows:

   Persons required to file

   (a) Except as provided in subsection (c) of this section, [an exception for common carriers] whoever, whether as principal, agent, or bailee, or by an agent or bailee, knowingly—
     (1) transports or causes to be transported monetary instruments—
       (A) from any place within the United States to or through any place outside the United States, or

   (B) to any place within the United States from or through any place outside the United States, or
     (2) receives monetary instruments at the termination of their transportation to the United States from or through any place outside the United States
   in an amount exceeding $5,000 on any one occasion shall file a report or reports in accordance with subsection (b) of this section.

   Contents of filed report

   (b) Reports required under this section shall be filed at such times and places, and may contain such of the following information and any additional information, in such form and in such detail, as the Secretary may require:
     (1) The legal capacity in which the person filing the report is acting with respect to the monetary instruments transported.
     (2) The origin, destination, and route of the transportation.
     (3) Where the monetary instruments are not legally and beneficially owned by the person transporting the same, or are transported for any purpose other than the use in his own behalf of the person transporting the same, the identities of the person from whom the monetary instruments are received, or to whom they are to be delivered, or both.
     (4) The amounts and types of monetary instruments transported.

that Dichne knowingly and willfully violated the provisions of the Act.

In *United States v. San Juan*, 545 F.2d 314 (2d Cir. 1976), this Court held that "in order to prove willfulness, the Government should make some effort to bring the reporting requirement to the traveler's attention". *Id.* at 319. Unlike the facts of *San Juan*, where the Government had made no such attempt, in the instant case the Government prominently displayed a number of large multi-colored posters in the airport departure area. These notices were posted in areas where the traveler was likely to be attentive to travel advice and warnings, and specifically advised travelers that they were required to report "$5000 or more in . . . monetary instruments" transported out of the country. The posted warnings additionally stated: *"Failure to do so can result in civil and criminal penalties"*. (emphasis in original)

In addition to these visual notices, departing passengers were verbally advised of the reporting requirement over the public address system. The Government's proof showed that this was done on no less than four separate occasions during the period when Dichne and his co-conspirators were waiting in the departure area. It is highly unlikely that he could have failed both to notice any of the posters and to hear any of the public announcements.

■ Dichne also contends that even if it can be conceded that he observed the posters and heard the announcements, the Government had not established beyond a reasonable doubt that he was aware that the endorsed check he carried required reporting. We hold that the District Court's finding that the check was "an instrument that [Dichne] could reasonably conclude was required to be reported" is supported by the stipulated evidence.

The announcement and posters each informed the public that they were required to report the transporting of over $5,000 in

"currency of the United States or any other country, or monetary instruments such as travelers checks, negotiable instruments in bearer form or money orders. . . ." While the express language of the notices thus referred to "negotiable instruments in bearer form", it is clear from the wording of these warnings that the instruments listed were not all inclusive, but merely served as several common examples of the general types of "monetary instruments" that must be reported. In view of the fact that the conspirators expressly required Tejpar to endorse the check in blank so that Dichne could deposit it, it is clear that Dichne was aware that the check he was carrying was indeed negotiable.[4] It is implausible that he was unaware that such a check constituted a "monetary instrument" within the meaning of the warning announcements and posters.

The District Court's conclusion that Dichne was aware that he was required to report the transporting of the check is supported by other facts. Dichne and his co-conspirators repeatedly expressed their desire for secrecy and for not reporting the transaction in any way. In recorded conversations, Tejpar explicitly told Jaegar that the funds were being "smuggled out to keep their source secret" and further stated that the principals "did no want to use conventional banking facilities in order to avoid any inquiry about the funds by American authorities". (Appellee's Brief at 20). Dichne himself, in discussing the transaction with Jaegar on October 6, stated that "he did not want any questions asked and did not want to be told the transaction had to be reported to the I.R.S." (Appellee's Brief at 20). This last statement indicates Dichne's familiarity with the domestic reporting requirements of the Act which require any banking institution carrying out a cash transaction involving more than $10,000 to file a report with the I.R.S. *See* 31 U.S.C. §§ 1081–1083. Furthermore, Dichne

---

4. That the check was negotiable is demonstrated by U.C.C. § 3–204(2) which provides:

"(2) An indorsement in blank specifies no particular indorsee and may consist of a mere

signature. An instrument payable to order and indorsed in blank becomes payable to bearer and may be negotiated by delivery alone until specially indorsed."

himself was a knowledgeable export-import broker, a fact which cannot be ignored. These facts make even less plausible Dichne's claim of ignorance of the Act's foreign reporting requirements.

Dichne and his co-conspirators were thus proved to have conducted themselves in a highly secretive manner, and also to have shown a knowledge of, and a desire to avoid, reporting requirements in general. While these secretive acts alone would not sufficiently support a judgment of conviction, such support is found when these facts are combined with the significant affirmative steps taken by the Customs Service to advise Dichne and other travelers of the reporting requirements of the Act. The stipulated evidence thus amply supports the District Court's finding that beyond a reasonable doubt Dichne knew that the negotiable check he was carrying had to be reported under the Bank Secrecy Act.

## II.

■ Dichne's next claim is that the reporting requirements contained in 31 U.S.C. § 1101 are unconstitutional in that they require the reporting of potentially self-incriminating information in violation of the fifth amendment. The District Court denied this claim, concluding that the transporting of over $5,000 out of the country was not "*per se* an illegal act causing the filing of the report to involve the signer in the admission of a crucial element of a crime; nor is the statute addressed to 'a highly selective group inherently suspect of criminal activities.' Legitimate governmental interest in the flow of currency across international borders is clearly enunciated by Congress in 31 U.S.C. § 1141 . . . ." (Joint Appendix at 8 (citations omitted)). We conclude that the District Court's finding as to the constitutionality of 31 U.S.C. § 1101 is correct.

■ The Supreme Court noted in *California v. Byers*, 402 U.S. 424, 91 S.Ct. 1535, 29 L.Ed.2d 9 (1971): "Whenever the Court is confronted with the question of a compelled disclosure that has an incriminating potential, the judicial scrutiny is invariably a

close one". *Id.* at 427, 91 S.Ct. at 1537. While an individual's right to avoid self-incrimination must not be treated lightly, the societal interest in establishing certain disclosure requirements also must not be ignored. Since many forms of compelled disclosure statutes present the potential for self-incrimination—some more acutely than others—a balance must be struck between the competing interest of the state and the individual when evaluating the constitutionality of a disclosure requirement. *See California v. Byers*, 402 U.S. at 427, 91 S.Ct. 1535. Various Supreme Court cases have confronted this balancing problem, and have established certain criteria for determining when the threat of self-incrimination from a disclosure statute is so offensive to the mandate of the fifth amendment as to render the statute unconstitutional.

These criteria were initially suggested in *Albertson v. Subversive Activities Control Board*, 382 U.S. 70, 86 S.Ct. 194, 15 L.Ed.2d 165 (1965). There, the statute at issue was the Subversive Activities Control Act of 1950, which required members of the Communist Party to register as such, thereby subjecting themselves to possible federal criminal prosecution. In holding that statute unconstitutional, the Supreme Court contrasted those registration requirements with the requirement to file tax returns upheld in *United States v. Sullivan*, 274 U.S. 259, 47 S.Ct. 607, 71 L.Ed. 1037 (1927). The Court in *Albertson* noted:

"In *Sullivan* the questions in the income tax return were neutral on their face and directed at the public at large, but here they are directed at a highly selective group inherently suspect of criminal activities. Petitioners' claims are not asserted in an essentially non criminal and regulatory area of inquiry, but against an inquiry in an area permeated with criminal statutes, where response to any of the form's questions in context might involve the petitioners in the admission of a crucial element of a crime." 382 U.S. at 79, 86 S.Ct. at 199.

Later Supreme Court cases utilized these criteria in striking down various disclosure

statutes. *See Leary v. United States*, 395 U.S. 6, 89 S.Ct. 1532, 23 L.Ed.2d 57 (1969) (registration of those who "deal in" marijuana); *Marchetti v. United States*, 390 U.S. 39, 88 S.Ct. 697, 19 L.Ed.2d 889 (1968) and *Grosso v. United States*, 390 U.S. 62, 88 S.Ct. 709, 19 L.Ed.2d 906 (1968) (registration of gamblers); *Haynes v. United States*, 390 U.S. 85, 88 S.Ct. 722, 19 L.Ed.2d 923 (1968) (registration of certain firearms). The Court's most recent pronouncement on this issue, *California v. Byers*, 402 U.S. 424, 91 S.Ct. 1535, 29 L.Ed.2d 9 (1971), reaffirmed the *Albertson* approach.

In *Byers* the Court upheld a statute requiring that drivers involved in road accidents report their names and addresses to the police. Summarizing its prior holdings, the Court concluded that "the disclosures condemned were only those extracted from a 'highly selective group inherently suspect of criminal activities' and the privilege was applied only in 'an area permeated with criminal statutes'—not in 'an essentially noncriminal and regulatory area of inquiry.'" *Id.* at 430, 91 S.Ct. at 1539. The Court additionally noted that the statutes struck down in prior cases had involved reporting requirements which created "'substantial hazards of self incrimination.'" *Id.* Based upon its finding that the automobile accident reporting statute was primarily regulatory rather than criminal and was directed at all drivers involved in accidents rather than at an inherently suspect group, *id.* at 430–31, 91 S.Ct. 1535, the Court held that it did not present such a

substantial risk of incrimination so as to outweigh the Governmental need for such a reporting statute. We conclude that based upon these criteria the reporting requirements of the Bank Secrecy Act are not constitutionally infirm.

Section 1101 requires the reporting of the transportation of over $5,000 in monetary instruments into or out of the United States.[5] The present form which must be filled out is United States Customs Service form 4790. This form requires personal identifying information such as name, address, and passport number, the type and amount of the currency, its destination and mode of transportation, and the identity and occupation of the person on behalf of whom, if any, the reporter is acting.

Initially, we note that the reporting requirement is directed at all persons travelling across the border with more than $5,000 in monetary instruments. Since the transportation of such amounts of currency is by no means an illegal act, the District Court was correct in its finding that the reporting requirement was not "addressed to 'a highly selective group inherently suspect of criminal activities.'" (Joint Appendix at 8). Unlike the statutes struck down by the Supreme Court in *Albertson, Leary, Marchetti, Grosso* and *Haynes*, which almost necessarily pertained to individuals involved in criminal activities, the vast majority of those affected by the requirements of § 1101 will be completely uninvolved in any related criminal action. The statute will

---

5. "Monetary instrument" is defined in 31 U.S.C. § 1052(*1*) which provides:

"(*1*) The term 'monetary instruments' means coin and currency of the United States, and in addition, such foreign coin and currencies, and such types of travelers' checks, bearer negotiable instruments, bearer investment securities, bearer securities, and stock with title passing upon delivery, or the equivalent thereof, as the Secretary may by regulation specify for the purposes of the provision of this chapter to which the regulation relates."

The regulations promulgated under this section make clear that a negotiable check endorsed in blank is within the definition of "monetary instruments". 31 C.F.R. § 103.11 defines "monetary instruments" as follows:

"Coin or currency of the United States or of any other country, traveler's checks, money orders, investment securities in bearer form or otherwise in such form that title thereto passes upon delivery, and *negotiable instruments . . . in bearer form or otherwise in such form that title thereto passes upon delivery.* The term includes bank checks, travelers' checks and money orders which are signed but on which the name of the payee has been omitted, but does not include bank checks, travelers' checks or money orders made payable to the order of a named person which have not been endorsed or which bear restrictive endorsements." (emphasis added).

pose no danger whatsoever to most international travelers, and as such cannot be faulted as being aimed at an inherently suspect group.

Additionally, the reporting requirement in question does not involve an area "permeated with criminal statutes". *Albertson v. Subversive Activities Control Board,* 382 U.S. at 79, 86 S.Ct. 194. In each of the Supreme Court cases holding a reporting requirement invalid, the reporting individual was required to reveal to the Government information which would almost necessarily provide the basis for criminal proceedings against him for the very activity that he was required to disclose. In *Leary* the marijuana dealing required to be reported was itself criminal "in every one of the 50 states". 395 U.S. at 16, 89 S.Ct. at 1538. The gambling activities required to be reported in *Marchetti* and *Grosso* were "widely prohibited under both federal and state law". 390 U.S. at 44, 88 S.Ct. at 700. The firearms required to be reported in *Haynes* were limited to certain concealable weapons "used principally . . . in unlawful activities", and the reporting requirement was "directed principally at those persons who [had] obtained possession of a firearm without complying with the Act's other requirements". 390 U.S. at 87, 96, 88 S.Ct. at 725, 730. The area of Communist Party membership required to be reported in *Albertson* was "permeated with criminal statutes". 382 U.S. at 79, 86 S.Ct. 194.

Unlike the disclosures involved in those cases, the reporting requirements of the Bank Secrecy Act do not involve a direct link to any related criminal activity. In fact, since there is nothing inherently illegal about transporting large sums of money into or out of the United States, any potential incrimination would of necessity involve a tangentially related criminal transaction. This finding again indicates that the risk of incrimination from the reporting statute is not substantial.

Against any risk of incrimination from the Act, however, must be balanced the governmental interest in establishing such a disclosure requirement. The policies behind this reporting statute are expressed in the Act's declaration of purpose, which states that the reports or records required will be useful not only for criminal purposes, but also in "tax, or regulatory investigations or proceedings". 31 U.S.C. § 1051. The purposes behind the enactment of § 1101 are further explained in the House Report which states:

"the purposes of Title II [of which § 1101 is a part] . . . are: (1) to facilitate the supervision of financial institutions properly subject to Federal supervision, (2) to aid duly constituted authorities in lawful investigations, and (3) to provide for the collection of statistics necessary for the formulation of monetary and economic policy". H.R.Rep.No.975, 91st Cong., 2d Sess., reprinted in [1970] U.S. Code Cong. & Admin.News, pp. 4394, 4405.

These statements by Congress clearly indicate the Government's concern with the flow of currency across the nation's borders. The legitimacy of such a concern is indicated by the fact that many other nations impose a direct restriction on the amount of currency permitted to be transported into or out of the country.[6] While Congress clearly intended the Act's disclosure requirements to be of some use in criminal proceedings, we regard these non-prosecutorial interests as substantial.

This conclusion is supported by District Judge Coffrin's opinion in *United States v. San Juan,* 405 F.Supp. 686 (D.Vt.1975), *rev'd on other grounds,* 545 F.2d 314 (2d Cir. 1976), apparently the only other reported case to thoroughly consider the constitutionality of the Bank Secrecy Act's reporting requirements in fifth amendment terms. While the District Court's opinion evinced a concern for what it perceived as the underlying prosecutorial purposes be-

---

**6.** England has just repealed her exchange restrictions. *New York Times,* Oct. 25, 1979 § D, p. 1, col. 1.

hind the Act, it nonetheless concluded that the reporting requirement could withstand a fifth amendment challenge in view of the legitimate governmental concern regarding its border activities.[7]

In view of the lack of a direct linkage between the required disclosure and the potential criminal activity, and in view of the fact that the statute is not directed at an "inherently suspect group", we conclude that the reporting requirement does not present such a "substantial risk of incrimination" so as to outweigh the governmental interest in requiring such a disclosure. As the Supreme Court concluded in upholding the automobile accident reporting statute in *California v. Byers:* "the mere possibility of incrimination is insufficient to defeat the strong policies in favor of a disclosure called for by statutes like the one challenged here". 402 U.S. at 428, 91 S.Ct. at 1538. In view of these considerations, the constitutionality of § 1101 is upheld.

### III.

■ Dichne's final claim is that the District Court committed reversible error when it allegedly failed to observe the time limits of the Speedy Trial Act (18 U.S.C. § 3161 *et seq.*). The District Court granted a postponement of the trial for approximately four weeks based upon the fact that a key Government witness had been indicted and therefore refused to testify because of the risk of self-incrimination. The District Court concluded that such a refusal to testify rendered the witness "unavailable" within the meaning of 18 U.S.C. § 3161(h)(3)(A), which provides that "[a]ny period of delay resulting from the absence or unavailability of . . . an essential witness" shall be

excluded from the Speedy Trial Act's time computation period. If this four week period had not been excluded from the computing time for trial under the Speedy Trial Act, the time delay would have exceeded the statutory requirements. We conclude that the propriety of the District Judge's interpretation of the meaning of "unavailability" for purposes of § 3161(h)(3)(A) does not have to be determined in the instant case.

While the Speedy Trial Act provides for dismissal of an indictment if the time provisions set forth are not followed, 18 U.S.C. § 3162(a)(2), this sanction was not to become effective until July 1, 1979. *See* 18 U.S.C. § 3163(c). Indeed, this time period has now been extended by Congress until July 1, 1980. *See* P.L. 96–43 (Aug. 2, 1979). Because the District Court decision to postpone the trial, and the defendant's ultimate trial, each occurred prior to the original effective date of the statute's sanctions, it is not necessary to determine if the time provisions of the Speedy Trial Act were in fact violated by the District Court's actions.

Other cases in this circuit have likewise determined that dismissal is not mandated prior to the effective date of the Speedy Trial Act's sanctions. *See United States v. Carini,* 562 F.2d 144, 148 (2d Cir. 1977); *United States v. Amendola,* 558 F.2d 1043, 1044 (2d Cir. 1977). *Accord United States v. Lee,* 575 F.2d 1184, 1185–87 (6th Cir. 1978). This conclusion is further supported by the Congressional finding that "no sanction [for violation of the Speedy Trial Act] is in effect during the phase-in period". H.R.Rep.No.1508, 93d Cong., 2d Sess. 32, *reprinted in* [1974] U.S.Code Cong. & Admin.News, pp. 7401, 7425.

---

7. The governmental interest in the flow of currency across the border is additionally indicated, as noted in District Judge Owen's memorandum, by the Congressional statement of findings in a later section of Title 31. 31 U.S.C. § 1141 provides:

"The Congress finds that—

(1) movements of mobile capital can have a significant impact on the proper functioning of the international monetary system;

(2) it is important to have as complete and current data as feasible on the nature and source of these capital flows, including transactions by large United States business enterprises and their foreign affiliates;

(3) it is desirable to emphasize this objective by supplementing existing legal authority for the collection of data on capital flows contained in section 95a of Title 12 and section 286f of Title 22."

Dismissal of the indictment is thus clearly not mandated by the Speedy Trial Act in the instant case. Further, we find that dismissal under the present circumstances would be a particularly unnecessary result. The delay was a short one and in no way prejudiced Dichne. Additionally, there is no indication of misconduct, bad faith, or even negligence on the part of the Government. Because the postponement was granted in the interest of justice, and involved no serious prejudice of the accused's rights, we conclude that the District Court's decision was not an abuse of discretion, and accordingly does not mandate dismissal of the indictment.

The judgment of conviction is therefore affirmed.