319 S.E.2d 364

**STATE ex rel. Rhonda L. OSBURN**

v.

**Phyllis Jean COLE, Clerk, etc., et al.
and Fairmont General Hospital.**

**No. 15787.**

Supreme Court of Appeals of
West Virginia.

Dec. 14, 1983.
Concurring Opinion March 6, 1984.

James A. Esposito, Roger D. Curry, Fairmont, for petitioner.

No Appearance, for respondents.

MILLER, Justice:

This case involves an issue relating to the assertion of the Fifth Amendment privilege against self-incrimination in the context of a claim for unemployment compensation.[1] The petitioner, Rhonda L. Osburn, was declared ineligible to receive unemployment compensation benefits because of her failure to furnish certain information to the Commissioner of Employment Security as she is required to by regulations promulgated under W.Va.Code, 21A-7-1.[2]

Ms. Osburn was employed as a registered surgical nurse at Fairmont General Hospital prior to January, 1980. After leaving her employment, she filed for, and was ruled eligible to receive, unemploy-ment compensation benefits. In September, 1980, Ms. Osburn was instructed to file a "Fact Finding Report" with the Commissioner of Employment Security concerning casual employment during July, 1980. Ms. Osburn indicated in the Fact Finding Report that for a period of four days, from July 28 to August 1, 1980, she was employed outside of the State of West Virginia and earned wages totaling $80.00. She declined to reveal the name or the location of her employer, as required by the form.

At the time, Ms. Osburn was under investigation by the West Virginia Department of Public Safety and the Office of the Prosecuting Attorney of Marion County with regard to an indictment which had been returned against her. A part of the investigation concerned a telephone call from an out-of-state location to a State Trooper at the Fairmont Detachment from an individual identifying herself as "Rhonda Osburn." The caller led the trooper to believe that she had been involved in the crime charged in the indictment.

When the Fact Finding Report was required to be filed, the police were attempting to trace Ms. Osburn to a specific out-of-state location. Ms. Osburn asserted that to reveal her employer's name and out-of-state address might result in incriminating evidence with regard to the pending criminal charges. She, therefore, asserted her privilege against answering incriminating questions and refused to state the precise location of her casual job.[3]

The Department of Employment Security suspended her unemployment benefits in-

---

1. "No person ... shall be compelled in any criminal case to be a witness against himself." U.S. Const.Amend. V. *See also* W.Va. Const. art. III, § 5.

2. W.Va.Code, 21A-7-1, provides: "Claims for benefits shall be made in accordance with the rules and regulations prescribed by the commissioner." Department of Employment Security, Adm.Reg. 21A-2, Series I, § 13.01 (1982), provides:

   "Initial, new, or additional claims for total unemployment shall be made on Form WVUC-B-6, as revised, setting forth (a) that the individual claims benefits, (b) that he has registered for work, (c) such other information as is required thereby. This claim for benefits for total unemployment shall constitute the individual's claim for benefits or waiting-period credit."

3. There is no claim made that the information on which she claimed the privilege was not in fact incriminating. It appears from the appellant's brief that after the criminal charges were resolved, Ms. Osburn did provide the full information requested. Once the information was provided, her benefits should have been reinstated if she otherwise remained eligible. The record does not reveal whether the Commissioner of Employment Security ever terminated Ms. Osburn's ineligibility status.

definitely, but did not disqualify her. The trial examiner, the Board of Review of the Department of Employment Security, and the Circuit Court of Kanawha County have each affirmed the suspension of her benefits.

■ The petitioner essentially is arguing that even though all of the required information was not provided, she should still be allowed to receive her benefits. She claims that to deny her benefits penalizes ner for exercising a constitutional right. The petitioner would have an exception carved out of the general rule that the claimant has the burden of proving eligibility for benefits [4] when the claimant's failure to carry that burden is a result of the exercise of the privilege against self-incrimination. We decline to create such an exception.

■ There can be little doubt that the Fifth Amendment privilege against self-incrimination is not limited to the context of criminal trials but "can be claimed in any proceeding, be it criminal or civil, administrative or judicial, investigatory or adjudicatory." *In re Gault*, 387 U.S. 1, 47, 87 S.Ct. 1428, 1454, 18 L.Ed.2d 527, 557 (1967). *See also Albertson v. Subversive Activities Control Board*, 382 U.S. 70, 86 S.Ct. 194, 15 L.Ed.2d 165 (1965) (administrative proceeding); *Quinn v. United States*, 349 U.S. 155, 75 S.Ct. 668, 99 L.Ed. 964 (1955) (legislative hearing); *United States v. Monia*, 317 U.S. 424, 63 S.Ct. 409, 87 L.Ed. 376 (1943) (grand jury); *McCarthy v. Arnd-*

*stein*, 266 U.S. 34, 45 S.Ct. 16, 69 L.Ed. 158 (1924) (civil case).[5]

Two rather distinct lines of United States Supreme Court cases have emerged in the self-incrimination area. One line of cases involves reporting systems in which classes of citizens or taxpayers have been required to provide information to the government under its regulatory or taxing powers. The other line of cases involves specific investigations of individuals who have a special relationship with the government, such as government contractors or public employees.

The first significant "reporting" case decided by the Supreme Court was *United States v. Sullivan*, 274 U.S. 259, 47 S.Ct. 607, 71 L.Ed. 1037 (1927), in which the defendant was convicted of willfully refusing to file an income tax return. The Court recognized that the defendant could have exercised the Fifth Amendment privilege by raising specific objections to certain questions, but could not completely refuse to file a return. "It would be an extreme if not an extravagant application of the 5th Amendment to say that it authorized a man to refuse to state the amount of his income because it had been made in crime." 274 U.S. at 263–64, 47 S.Ct. at 607, 71 L.Ed. at 1040.

In *Albertson v. Subversive Activities Control Board*, 382 U.S. 70, 86 S.Ct. 194, 15 L.Ed.2d 165 (1965), suspected members of the Communist Party of the United States had been ordered by the Board to register themselves as party members.

---

4. We have traditionally held that when a claimant seeks unemployment compensation benefits, the burden of proving eligibility is upon the claimant. *Thomas v. Rutledge*, W.Va., 280 S.E.2d 123, 130 (1981). *See also Duenas-Rodriguez v. Industrial Commission*, 199 Colo. 95, 606 P.2d 437 (1980); *Howell v. Administrator*, 174 Conn. 529, 391 A.2d 165 (1978); *Howard v. Department of Employment*, 100 Idaho 314, 597 P.2d 37 (1979). Once an applicant has been determined eligible to receive benefits, there is a continuing burden to provide the required information in order to prevent the benefits from being terminated. As stated in *Baker v. Department of Employment Security*, 564 P.2d 1126, 1127 (Utah 1977), "[t]he initial and continuing burden of proof to establish eligibility to receive benefits" remains with the claimant.

5. For commentaries on the use of the privilege in civil litigation, *see* Bennett, *Representing a Defendant in Simultaneous Criminal and Administrative Proceedings: A Practical Approach*, 27 Am.U.L.Rev. 381 (1978); Daskal, *Assertion of the Constitutional Privilege Against Self-Incrimination in Federal Civil Litigation: Rights and Remedies*, 64 Marquette L.Rev. 243 (1980); Litchford, *The Privilege Against Self-Incrimination in Civil Litigation*, 57 Fla.Bar J. 139 (1983); Comment, *Penalizing the Civil Litigant Who Invokes the Privilege Against Self-Incrimination*, 24 U.Fla.L.Rev. 541 (1972); Comment, *The Privilege Against Self-Incrimination in Civil Litigation*, 1968 U.Ill.L.Forum 75 (1968); Comment, *Use of the Privilege Against Self-Incrimination in Civil Litigation*, 52 Va.L.Rev. 322 (1966).

The Court noted that "an admission of membership may be used to prosecute the registrant" under at least two federal statutes and this fact "presents sufficient threat of prosecution to support a claim of the privilege." 382 U.S. at 77, 86 S.Ct. at 198, 15 L.Ed.2d at 171. The Government argued that under *United States v. Sullivan, supra,* it would be possible to exercise the privilege against self-incrimination as to some questions but that *Sullivan* would not support the failure to file the form at all. The Court in rejecting this argument made this distinction:

> "In *Sullivan* the questions in the income tax return were neutral on their face and directed at the public at large, but here they are directed at a highly selective group inherently suspect of criminal activities. Petitioners' claims are not asserted in an essentially noncriminal and regulatory area of inquiry, but against an inquiry in an area permeated with criminal statutes, where response to any of the form's questions in context might involve the petitioners in the admission of a crucial element of a crime." 382 U.S. at 79, 86 S.Ct. at 199, 15 L.Ed.2d at 172.

Subsequently, the United States Supreme Court, citing *Albertson,* decided three cases on the same day, all of which involved reporting requirements. In the first case, *Marchetti v. United States,* 390 U.S. 39, 88 S.Ct. 697, 19 L.Ed.2d 889 (1968), the defendant was convicted of willfully failing to register and to pay an occupational tax for engaging in the business of accepting wagers. The defendant, asserting his privilege against self-incrimination, refused to register and pay the tax because the information could be used in a separate proceeding to prosecute him for gambling. Although the Court did not declare the tax unconstitutional, it held "that those who properly assert the constitutional privilege as to these provisions may not be criminally punished for their failure to comply with their requirements." *Marchetti,* 390 U.S. at 61, 88 S.Ct. at 709, 19 L.Ed.2d at 905.

The Court reached the same conclusion in *Grosso v. United States,* 390 U.S. 62, 88 S.Ct. 709, 19 L.Ed.2d 906 (1968). Grosso was convicted of willful failure to pay the excise tax imposed on wagering because he asserted that payment would have obliged him to incriminate himself in violation of the Fifth Amendment privilege. The Court concluded that since it was reasonable to expect the tax payment information to be given to state and federal prosecutors, the defendant could not be compelled to provide information which would ultimately be incriminating in another forum. The Supreme Court noted that these reporting requirements are aimed at individuals in " 'an area permeated with criminal statutes,' where [they are] 'inherently suspect of criminal activities.' *Albertson v. SACB,* 382 U.S. 70, 79 [86 S.Ct. 194, 199, 15 L.Ed.2d 165, 172]." 390 U.S. at 64, 88 S.Ct. at 712, 19 L.Ed.2d at 910.

Finally, in *Haynes v. United States,* 390 U.S. 85, 88 S.Ct. 722, 19 L.Ed.2d 923 (1968), the Court again allowed the defendant to successfully assert his Fifth Amendment privilege by withholding information. The defendant was convicted of knowingly possessing an unregistered sawed-off shotgun in violation of federal gun registration requirements. The defendant argued that if he registered the gun, it would have subjected him to prosecution for violation of other provisions of federal gun laws. The Court reversed his conviction largely because the registration requirement was "unfair." [6] The Court noted in *Haynes* that not everyone who possessed a firearm must have it registered. Instead, the registration requirement is aimed at those who have already violated some other provision. "The registration requirement is thus directed principally at those persons who have obtained possession of a firearm without complying with the Act's other requirements, and who therefore are immediately threatened by criminal prosecutions." *Haynes,* 390 U.S. at 96, 88 S.Ct. at 730, 19 L.Ed.2d at 932.

---

6. *See* Powell and Jones, *Self-Incrimination and Fair Play—Marchetti, Grosso and Haynes Examined,* 18 Am.U.L.Rev. 114 (1968).

The distinction between *Sullivan,* on the one hand, and *Marchetti, Grosso,* and *Haynes,* on the other, is that in *Sullivan* the government was seeking neutral information as part of an essentially noncriminal, regulatory scheme, and the Fifth Amendment claim was "extreme" and "extravagant" because it was too general. In *Marchetti, Grosso,* and *Haynes,* the information sought by the government was not neutral, but was directed at specific criminal activity, and the Fifth Amendment claims were directed at the threatened prosecutorial use of the information. Moreover, in *Marchetti* and *Grosso,* filing the form and paying the gambling tax would expose them to prosecution under anti-gambling statutes. Yet, if they did not file the gambling tax form and pay the tax, they could be prosecuted under the gambling tax statute. Thus, a substantial exposure to criminal prosecution occurred in either event.

The distinctions drawn in *Albertson* between its facts and Sullivan's were adopted as a controlling rule in *California v. Byers,* 402 U.S. 424, 91 S.Ct. 1535, 29 L.Ed.2d 9 (1971).[7] In *Byers,* the defendant was charged with passing another vehicle without maintaining a safe distance, and in a second count with failing to comply with California's "hit and run" statute which required a driver of a vehicle involved in an accident to stop at the scene and give his name and address. The defendant claimed the second count violated his Fifth Amendment privilege. If he were required after an accident to comply with the "hit and run" statute by stopping and giving his name and address, he argued that he would supply information that would be self-incriminating, presumably on any violations of the motor vehicle law arising from the accident.

The Supreme Court in *Byers* began with a recognition of the difficult task of drawing the line between permissible and prohibited compelled disclosure.[8] The Court then proceeded to analyze the statute utilizing the *Albertson* standards: Is the information sought by the government neutral on its face? Is the information requirement directed at the public at large or at a selective group inherently suspect of criminal activities? Is the area of inquiry essentially noncriminal and regulatory or is it permeated with criminal statutes? Would compliance with the disclosure requirement subject the party to substantial hazards of self-incrimination? The Court concluded that the statute did not violate the Fifth Amendment right against self-incrimination.[9] *See also Garner v. United States,* 424 U.S. 648, 96 S.Ct. 1178, 47 L.Ed.2d 370 (1976).

The appellant relies on the second line of cases illustrated by *Lefkowitz v. Turley,* 414 U.S. 70, 94 S.Ct. 316, 38 L.Ed.2d 274 (1973), and which involved governmental investigations of individuals. In *Lefkowitz,* two architects refused to testify before a grand jury and also refused to sign a waiver of immunity from prosecution. The district attorney then threatened to utilize a

---

**7.** Although the Chief Justice's opinion is characterized as a plurality opinion of four members of the Court, Mr. Justice Harlan concurred in the result and formulated a test not substantially different.

**8.** "Whenever the Court is confronted with the question of a compelled disclosure that has an incriminating potential the judicial scrutiny is invariably a close one. Tension between the State's demand for disclosures and the protection of the right against self-incrimination is likely to give rise to serious questions. Inevitably these must be resolved in terms of balancing the public need on the one hand, and the individual claim to constitutional protections on the other; neither interest can be treated lightly." 402 U.S. at 427, 91 S.Ct. at 1537, 29 L.Ed.2d at 17.

**9.** A number of federal courts of appeals have applied the *Byers* test to uphold a variety of government reporting requirements against the claim that they violated the privilege against self-incrimination. *E.g., United States v. Dichne,* 612 F.2d 632 (2d Cir.1979), *cert. denied,* 445 U.S. 928, 100 S.Ct. 1314, 63 L.Ed.2d 760 (1980) (Currency and Foreign Transaction Reporting Act, 31 U.S.C. § 1101); *Field v. Brown,* 610 F.2d 981 (D.C.Cir.1980), *cert. denied,* 446 U.S. 939, 100 S.Ct. 2160, 64 L.Ed.2d 792 (Department of Defense directive requiring retired officers to report transactions with government); *United States v. Stirling,* 571 F.2d 708 (2d Cir.), *cert. denied,* 439 U.S. 824, 99 S.Ct. 93, 58 L.Ed.2d 116 (1978) (S.E.C. registration forms).

statute authorizing cancellation of their existing contracts and barring them from future contracts with the state for five years if they refused to testify and waive immunity. The Supreme Court, on a challenge that the statute violated the Fifth Amendment privilege against self-incrimination, held that it did. The Court after reviewing earlier compelled testimony cases stated:

"We agree with the District Court that *Garrity* [*v. New Jersey*, 385 U.S. 493, 87 S.Ct. 616, 17 L.Ed.2d 562 (1967).], *Gardner* [*v. Broderick*, 392 U.S. 273, 88 S.Ct. 1913, 20 L.Ed.2d 1082 (1968) ], and *Sanitation Men* [*v. Sanitation Comm'r*, 392 U.S. 280, 88 S.Ct. 1917, 20 L.Ed.2d 1089 (1968) ] control the issue now before us. The State sought to interrogate appellees about their transactions with the State and require them to furnish possibly incriminating testimony by demanding that they waive their immunity and by disqualifying them as public contractors when they refused. It seems to us that the State intended to accomplish what *Garrity* specifically prohibited—to compel testimony that had not been immunized. The waiver sought by the State, under threat of loss of contracts, would have been no less compelled than a direct request for the testimony without resort to the waiver device. A waiver secured under threat of substantial economic sanction cannot be termed voluntary." 414 U.S. at 82–83, 94 S.Ct. at 324–25, 38 L.Ed.2d at 284.[10]

The vice in *Lefkowitz* and its related cases lies in the element of compulsion initially exercised by the state to secure testimony which it desired, even though it

may have been incriminating, and without any concurrent offer of immunity against further prosecution. Here, the element of compulsion is absent as the State is not directly seeking to secure incriminating testimony from the appellant but is requesting information to warrant payment of continued benefits. We, therefore, conclude that *Lefkowitz* and its related line of compelled testimony cases are not applicable.

■ The analysis which has emerged from the reporting cases can be applied to Ms. Osburn's claim of the Fifth Amendment privilege. The information sought by the Department of Employment Security is facially neutral. There is nothing inherently suspicious about asking an applicant for unemployment compensation where and by whom they were employed. Although the request for this information was not made on the public at large, the group upon which it was made (unemployment compensation claimants) is not suspect of criminal activities. Additionally, while the unemployment compensation scheme may provide for criminal penalties for fraud, the system is hardly permeated with criminal statutes. The purpose of the unemployment compensation system is to provide benefits for victims of unfortunate economic circumstances, not to trap them into criminal prosecutions. Finally, no criminal penalty was imposed for failure to comply with the reporting statute. Thus, the appellant's exercise of her privilege against self-incrimination did not expose her to the *Albertson*, *Marchetti* and *Grosso* situation where the failure to file the reporting form was itself a crime.

---

**10.** The Court did recognize in *Lefkowitz, supra,* that the State might compel such testimony so long as it or its fruits are unavailable for use against the defendant:

"We should make clear, however, what we have said before. Although due regard for the Fifth Amendment forbids the State to compel incriminating answers from its employees and contractors that may be used against them in criminal proceedings, the Constitution permits that very testimony to be compelled if neither it nor its fruits are available for such use. *Kastigar v. United States,* [406 U.S. 441, 92 S.Ct. 1653, 32 L.Ed.2d 212 (1972) ]. Furthermore, the accommodation

between the interest of the State and the Fifth Amendment requires that the State have means at its disposal to secure testimony if immunity is supplied and testimony is still refused. This is recognized by the power of the courts to compel testimony, after a grant of immunity, by use of civil contempt and coerced imprisonment. *Shillitani v. United States,* 384 U.S. 364 [86 S.Ct. 1531, 16 L.Ed.2d 622] (1966). Also, given adequate immunity, the State may plainly insist that employees either answer questions under oath about the performance of their job or suffer the loss of employment." 414 U.S. at 84, 94 S.Ct. at 325–26, 38 L.Ed.2d at 285–86.

This issue has arisen in several state unemployment cases and the courts have denied benefits but without any real discussion of the self-incrimination issues. In *Bastas v. Board of Review*, 155 N.J.Super. 312, 382 A.2d 923 (1978), unemployment compensation benefits were denied because the applicant, claiming the privilege against self-incrimination, refused to provide an alien registration card or any proof that she could lawfully work in this country. Without any analysis of the assertion of the privilege in this context, the denial of the applicant's unemployment compensation was affirmed.

In *Alonso v. State*, 50 Cal.App.3d 242, 123 Cal.Rptr. 536, *cert. denied*, 425 U.S. 903, 96 S.Ct. 1492, 47 L.Ed.2d 752 (1975), the court also concluded that a claimant who cannot prove eligibility for unemployment compensation benefits is not entitled to receive them. The claimant refused to provide information with respect to his immigration status, claiming not that the information was incriminating, but that it was irrelevant. The court, in disagreeing with the claimant's argument, also found that the information was not privileged under the Fifth Amendment. Just as in *Bastas v. Board of Review, supra*, no relevant analysis of the Fifth Amendment issue was offered.

A rather thorough discussion of the self-incrimination issue was made in *15,844 Welfare Recipients v. King*, 474 F.Supp. 1374 (D.Mass.1979). In that case, welfare recipients sought an injunction against certain state officials claiming that some of the reporting practices initiated as a result of an earlier welfare fraud investigation violated their privilege against self-incrimination. Part of the procedure attacked

was a requirement for collateral verification of nonemployment or face termination of benefits. The court summarized *Byers* principles and held the collateral verification procedures were not improper.[11]

On an analogous issue, in *Blumenthal v. Federal Communications Commission*, 318 F.2d 276 (D.C.Cir.1963), petitioners had applied for radio operator licenses. Their applications were dismissed because the applicants failed to respond adequately to questions concerning their membership in organizations advocating the violent overthrow of the government. Petitioners asserted their Fifth Amendment privilege and claimed that the Commission should issue the licenses as they otherwise would be punished for exercising their privilege against self-incrimination. The court rejected their claim stating:

"The Fifth Amendment privilege protects a person who invokes it from self-accusation; but when he seeks a license at the hands of an agency acting under the standard of the public interest, and information substantially relevant to that standard is withheld under the privilege, as may be done, the need for the information and the cooperation of the applicant with respect to it remains. The agency cannot be required to act without the information. To hold otherwise would carry the privilege beyond its purpose. While its invocation may not be considered ground for disqualification, for the privilege is available to the innocent as well as to the non-innocent, the lack of relevant information which follows in the wake of its assertion leaves a gap in data which the applicant can sup-

11. The relevant language from *15,844 Welfare Recipients v. King*, 474 F.Supp. at 1385, is:

"First, the Fifth Amendment privilege is not violated by mandatory self-reporting essential to fulfillment of the objectives of a regulatory statute where disclosures are not extracted from a highly selective group inherently suspect of criminal activities but rather apply to the general public and to activities that are generally lawful and where the possibility of incrimination is not substantial. *California v. Byers*, 1971, 402 U.S. 424, 91 S.Ct. 1535, 29 L.Ed.2d 9; *United States v. Stirling*, 2 Cir.

1978, 571 F.2d 708, 727–28. All of these conditions are met by the verification requirement in this case. It is essential to redetermining eligibility and thus to allocating scarce welfare resources fairly; the welfare assistance field is not one 'permeated with criminal statutes,' *Byers, supra*, 402 U.S. at 430, 91 S.Ct. 1535, 1539; the self-reporting requirement serves a regulatory, non-criminal purpose and AFDC recipients are not 'a highly selective group inherently suspect of criminal activities.' The state's regulatory interest is, therefore, compelling."

ply." 318 F.2d at 279. (Footnote omitted)[12]

*See also Copeland v. Secretary of State,* 226 F.Supp. 20 (S.D.N.Y.1964).

■ In conclusion, we adhere to the test formulated in *Albertson v. Subversive Activities Control Board, supra,* and *California v. Byers, supra,* that the Fifth Amendment privilege against self-incrimination is not violated by information required to be furnished under State mandatory self-reporting systems which are essential to the fulfillment of a regulatory statute where (1) the information sought is facially neutral; (2) the information required is directed at the public at large and not to a selective group inherently suspect of criminal activities; (3) the area of inquiry is essentially noncriminal and regulatory and not permeated with criminal statutes; and (4) the possibility of incrimination is not substantial.

As previously discussed, we find that the requested information did not violate the Fifth Amendment privilege against self-incrimination. The Commissioner of Employment Security could require the disclosure of Ms. Osburn's employer's name and address, and in the absence of obtaining the information could suspend Ms. Osburn's benefits for the involved period.

For the foregoing reasons, we affirm the judgment of the Circuit Court of Kanawha County.

Affirmed.

McGRAW, Justice, concurring:

Although I concur with the conclusion reached, several points should be clarified. First, merely because claimants for governmental benefits cannot utilize the fifth amendment without forfeiting their right to those benefits in certain circumstances does not mean that claimants can be compelled to waive their fifth amendment privilege. The only compulsion in general will be economic. Second, as indicated in footnote three of the majority opinion, once a claimant finally does disclose the information requested, benefits must be reinstated as if the claimant had initially complied, as long as the claimant is not otherwise ineligible for benefits. Therefore, a claimant for benefits could continue to refuse to disclose the information requested until final disposition of pending criminal charges, and then, upon disclosure of the information, the claimant would be entitled to receive those benefits which had previously been denied. For example, in this case, because Ms. Osburn eventually provided the information requested, the majority correctly notes that her suspended benefits should be reinstated. With these clarifications, I concur with the majority opinion.

HARSHBARGER, Justice, dissenting:

I dissent because to force Ms. Osburn to reveal what she thought to be incriminating information about herself in order to obtain unemployment compensation benefits to which she was otherwise clearly entitled to allow her to eat and maintain her life, is violently unconstitutional.

What is the difference between this fact situation and one in which detectives deprive a suspect of food and drink to force an incriminating statement from him or her? The only difference is the subtlety of this method—it is not blatant because the instrument of deprivation is seemingly bland government regulations.

In compliance with government instructions, Ms. Osburn voluntarily reported four days of casual employment and her income from that out-of-state work. Her report informed the unemployment compensation commissioner about her temporary work—a fact that he would not have otherwise known. She gave information necessary for determining the extent of her eligibility, that is, when she worked and how much she earned; but refused to report the name and address of her employer because that information might have incriminated her in a separate criminal investigation unrelated to unemployment benefit entitle-

---

12. As the D.C. District Court noted in another case, *Pinkney v. District of Columbia,* 439 F.Supp. 519 (D.C.D.C.1977), although the plaintiff had a difficult choice, it was not one of constitutional dimensions because there was no compulsion involved.

ment. *The veracity of her report was unchallenged.*

I would decide this case for Ms. Osburn. She provided the government with sufficient evidence to prove her eligibility. No one challenged the authenticity of her employment data, and requiring her, under threat of deprivation of funds for living, to give additional information jeopardizing her constitutional right against self-incrimination, is unconstitutional coercion. I would reverse the trial court and reinstate her benefits.